**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Marshall Ray MARKS, John D. Taylor, William J. Campbell, and Thomas E. Pals, Defendants-Appellants.**

Nos. 85–2325, 85–2326, 85–2327, 85–2339.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1987.

Decided April 16, 1987.

Thomas J. Fahey, Danville, Ill., R. Corydon Finch, Anna, Ill., Ronald R. Eckiss, Marion, Ill., Harris, Lambert & Wilson, for defendants-appellants.

Michael C. Carr, Asst. U.S. Atty., Benton, Ill., Frederick J. Hess, U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before CUMMINGS and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

The four defendants whose appeals we have consolidated were charged, along with others, with conspiring to distribute a large amount of marijuana between 1981 and 1984. The jury convicted them, and the judge sentenced each to six years in prison. The kingpin of the conspiracy was Jack Hrvatin. The appellants were cogs in the operation, and their minor role provides the principal theme of their appeals.

■ We begin with Marks, who is alleged to have acted as a courier of drugs and money for Hrvatin and who raises three issues requiring discussion. The first is whether there was sufficient evidence to justify the jury's finding him guilty beyond a reasonable doubt. The only direct evidence against him was the testimony of Ernest and Nancy Poland, conspirators who turned state's evidence. The weaknesses in this evidence are three-fold. First, the Polands had a strong incentive to give testimony supporting the government's case, since the more defendants they could put in the government's bag the more lenient the treatment they could expect from the government. Second, Ernest Poland was an extraordinarily heavy user of drugs, and whether for this or other reasons had an extremely poor memory. Third, while the evidence showed that Marks had been involved in drug dealings with Hrvatin and the Polands for a considerable period beginning in 1974, there was virtually no evidence except the Polands' word that he had continued dealing with them in the period covered by the indictment.

These weaknesses, whether singly or together, are not fatal. Frequently the principal witnesses in drug cases are turncoat former associates of the defendants, and their credibility is for the jury to determine. While Ernest Poland had an abnormally poor memory, there is no indication that Nancy Poland did. Her testimony alone was enough to convict Marks. She was unequivocal in placing Marks' courier work within the period covered by the indictment.

■ Next, Marks objects to the admission of the evidence of his dealings with Hrvatin and the Polands before that period. There is always a danger of smearing a defendant with evidence of crimes that—maybe because the government couldn't prove his guilt of them beyond a reasonable doubt—he is not formally charged with. If, however, the other crimes are relevant to those he is charged with, are established by clear and convincing evidence that is not unduly prejudicial, and are not just being used to show that the defendant has a propensity to commit crimes, evidence of their commission is admissible in the district judge's discretion. See, e.g., *United States v. Beasley,* 809 F.2d 1273, 1277–78 (7th Cir.1987); *United States v. Shackleford,* 738 F.2d 776, 779

(7th Cir.1984); Fed.R.Evid. 403, 404(b). These conditions are satisfied here. The history of Marks' dealings with Hrvatin and the Polands explained why Hrvatin was willing to entrust Marks with large quantities of drugs and cash even though Marks lived in Marseilles (near Peoria), which is 300 miles north of Carbondale, where Hrvatin lived. Marks had moved to Marseilles two years before the period covered by the indictment. The history also explained how the Polands had come to meet Marks, and undermined his testimony that he was only slightly acquainted with them. Moreover, evidence about the history was necessary just to make the Polands' testimony intelligible to the jury, which would wonder how the Polands had found themselves engaged in drug dealings with him. The government could not have elicited a coherent story from the Polands without asking them where and when and in what circumstances they had met Marks, and the answers to these questions would inevitably bring out the history of Marks' criminal involvement with the Hrvatin group. The evidence of that involvement was as strong as the evidence of Marks' guilt during the period covered by the indictment, so the requirement that the evidence of the other crimes be clear and convincing was satisfied. And the evidence was not unduly prejudicial, for almost Marks' entire defense was that he had indeed been involved in drug dealing with Hrvatin at an earlier time but had quit before the period covered by the indictment and that the Polands in their testimony had mixed up the two periods.

■ The only troublesome part of this evidence is the testimony by Wayne Danis concerning his purchases of marijuana from Marks in the 1970s, for there was no evidence that Danis was part of the Hrvatin group. His evidence thus was not part of the essential background to Marks' dealings with the Hrvatin group in the period covered by the indictment. And it was dramatic evidence—a description of giant bales of marijuana, and of large quantities of cash stashed in a freezer. But it was not completely irrelevant. In the course of describing his dealings with Marks, Danis testified that he had seen Marks at Hrvatin's liquor store during the period covered by the indictment, and also that Marks had moved to Marseilles to service Hrvatin's customers in the Peoria area. This was not only background to the Polands' testimony about Marks' involvement with the Hrvatin group during the period covered by the indictment (explaining how Marks could be part of a conspiracy with Hrvatin while living 300 miles away); it was evidence that Marks had continued working for Hrvatin during this period. Marks had gone to Marseilles as Hrvatin's agent two years before and might well have still been his agent two years later, as the Polands testified. We do not think the probative value of this evidence, slight as it was, was so clearly outweighed by its prejudicial effect as to warrant our reversing the district judge's evidentiary ruling. For the incremental prejudicial effect was not great, since extensive other evidence of Marks' marijuana dealings in the 1970s had been (we have just held) properly admitted.

Third, Marks (joined by the other defendants) complains about the district judge's handling of the "302's." These are FBI interview reports. In cross-examining the Polands and other prosecution witnesses, the defendants' lawyers would read something from a piece of paper (the 302) and ask the witness whether he had made that "statement." The judge required the lawyer to show the 302 to the witness and ask the witness whether he adopted the statement in it. The defendants complain that their lawyers should not have been required to do this.

■ No longer, when a lawyer asks a witness whether he made a certain statement, written or not, is the lawyer required (as he was at common law, see Note of Advisory Committee to Fed.R.Evid. 613(a)) to show the statement or disclose its contents to the witness, though he must upon request show it to opposing counsel. Fed. R.Evid. 613(a). If the witness answers "no," the lawyer can then try to prove that the witness indeed made the statement, but the witness must at that point be given an opportunity to explain or deny it, i.e., to

rebut the cross-examiner's proof. Fed.R. Evid. 613(b). In this case, however, the prosecution was concerned that the jury, seeing Marks' lawyer reading from a written report of some sort, would infer that if the witness denied having made the statement read by the lawyer, the witness must be lying, though in fact the FBI agent who had made the report might have gotten the witness's story down wrong and might have failed to ask the witness to read and sign the statement. The judge responded to this concern by telling the defense lawyer to show the report to the witness. If the witness denied that the statement attributed to him in the report was his statement, the lawyer could then call to the stand the FBI agent who had written the report, in an effort to establish that the witness was lying in denying having made the statement. The assertion made by all three of the defendants' lawyers at the oral argument of the appeals that the judge forbade them to call the agents as witnesses does not appear in their briefs and is not supported by the record.

 If defense counsel had been reading from a transcript of a previous trial or deposition, there would have been no justification for the district judge's procedure. But since a statement appearing in an interview report could easily be garbled, yet seem authoritative when read from a paper that the jury would infer was an official FBI document, the judge was reasonable in insisting that the witness be allowed to examine his purported statement before being impeached by it. If the witness denied it was his statement, the matter could then be resolved by calling the FBI agent who had compiled the report. We do not think Rule 613(a) was intended to take away the district judge's discretion to manage the trial in a way designed to promote accuracy and fairness; and while it would be wrong for a judge to say, "In my court we apply the common law rule, not Rule 613(a)," he is entitled to conclude that in particular circumstances the older approach should be used in order to avoid confusing witnesses and jurors. See *United States v. Nacrelli,* 468 F.Supp. 241, 253–54 (E.D.Pa.1979), aff'd without opinion, 614 F.2d 771 (3d Cir.

1980). On one occasion it turned out that counsel was trying to impeach Mrs. Poland's testimony by reading from her husband's 302; and there were like occasions on which the procedure followed by the district judge protected the jury from being confused. The judge's *ad hoc* recurrence to the common law was not reversible error per se. The procedure did not impede the cross-examination of the prosecution's witnesses (except insofar as defense counsel may have wanted to confuse them and the jury) or cause any other prejudice to the defendants.

 Defendant Pals was another courier for Hrvatin; in addition he stored marijuana for the conspiracy in his home. He too complains about the sufficiency of the evidence, but his complaint is weaker than Marks' because the Polands' testimony against Pals was corroborated by telephone company records showing a number of calls between the Polands and him during the period covered by the indictment. We are not impressed by the argument, rejected in many cases, see, e.g., *United States v. Lewis,* 759 F.2d 1316, 1343–44 (8th Cir.1985); *United States v. Weisz,* 718 F.2d 413, 432 n. 116 (!) (D.C.Cir.1983); *United States v. Atchley,* 699 F.2d 1055, 1058–59 (11th Cir.1983); *United States v. Polizzi,* 500 F.2d 856, 905–06 (9th Cir.1974); *United States v. Novick,* 124 F.2d 107, 110 (2d Cir.1941), that such records are inadmissible because all they show is the time and place of the calls—they do not reveal the name of the caller or of the person called, or the subject of the conversation. The question is not whether the phone records have great probative weight but whether they have any weight, in which event the district court had broad discretion, see Fed.R.Evid. 403, not abused here, to admit them. They have some weight. Communication is not a sufficient condition of conspiracy but it is a necessary condition; and while it is possible that in a call from Pals' home to the Polands' home the parties were the Polands' and Pals' teenage daughters rather than their fathers, the evidence of repeated telephone communications between Pals' home and that of Hrvatin's

admitted coconspirators increases the likelihood that Pals himself was a member of the conspiracy. Evidence that increases the likelihood of a fact sought to be proved is probative of that fact, by definition. Of course by itself the evidence would have no value, because it is not yet a crime to be acquainted with a drug dealer; but the probative value of evidence often depends on its being part of a mosaic. The Polands testified that Pals was part of the conspiracy; the telephone records provided some, though perhaps only slight, corroboration of this testimony.

▮▮▮▮ We come to the remaining minor cogs, Taylor and Campbell. The evidence against them was indirect, because the Polands had no dealings with them; but it was strong enough. The evidence against Taylor included telephone company records showing many calls between his phone, Hrvatin's, and that of Sidney Hall (another member of the conspiracy during the period covered by the indictment), and an incident in a bar where both he and Campbell threatened a government witness during the trial. The telephone evidence is more powerful than in the case of Pals, because it links Taylor to two conspirators, and the likelihood that such a linkage was purely social is reduced. Taylor's counsel argues that threatening a witness is not tantamount to an acknowledgment of guilt —indeed, if one were innocent, one's wrath against the witness might be greater than if one were guilty: it might be righteous indignation against a perjurer. But against this it can be argued that a person has more to gain from threatening a truthful than a lying witness, because the former is inherently more credible; so maybe the temptation to threaten the truthful witness is greater, after all. In any event, evidence of threats against a prosecution witness has long been admissible "as an indication of [the defendant's] consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit." 2 Wigmore, Evidence

§ 278(2) (Chadbourn ed. 1979). See, e.g., *United States v. Flick*, 516 F.2d 489, 495 (7th Cir.1975); *United States v. Rosa*, 705 F.2d 1375, 1377–78 (1st Cir.1983). The rule is too well settled to be disturbed on the flimsy grounds advanced by Taylor. Evidence that a witness was threatened was therefore some evidence linking Taylor to the conspiracy, like the phone calls; was not unduly prejudicial; and is a type of evidence that is well within the jury's capacity to evaluate in the light of common experience.

In addition to the evidence of the threat and the phone calls, there was testimony that Taylor had sold marijuana (during the period covered by the indictment) obtained from "Sidney" in Carbondale. Carbondale was the hub of the Hrvatin group's operation, and Sidney Hall was a worker in Hrvatin's marijuana operation, as well the owner of a phone from which calls were made to Taylor's phone. So "Sidney" must have been Sidney Hall, and one who buys from a conspirator for resale is a member of the conspiracy if he knows at least its general aims, see, e.g., *United States v. Andrus*, 775 F.2d 825, 853–54 (7th Cir. 1985); the telephone link-ups with Hrvatin suggest that Taylor did. There was also testimony that Hall and Hrvatin discussed Taylor and that Taylor talked about Sidney's going to a warehouse to get marijuana. There was enough evidence to convict Taylor.

▮▮▮▮ As for Campbell, there was evidence that he sold marijuana obtained from Taylor and from "Sidney," and this evidence, by tying Campbell to Taylor and to Hall, likewise tied him to Hrvatin, their source and the kingpin of the conspiracy. More important, Campbell, unlike Taylor, said when threatening the witness that if the witness told the jury everything the witness knew, he (Campbell) would be in the soup. This was an implicit admission of his involvement in the conspiracy.

AFFIRMED▮▮▮▮