#25745-a-GAS

**2011 S.D. 74**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

CHRISTOPHER BRIAN FISHER,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE PATRICIA C. RIEPEL
Judge

* * * *

MARTY J. JACKLEY
Attorney General

MATT T. ROBY
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                      and appellee.

NICOLE LAUGHLIN
Minnehaha County Public
 Defender's Office
Sioux Falls, South Dakota                    Attorneys for defendant
                      and appellant.

* * * *

ARGUED OCTOBER 3, 2011

OPINION FILED **11/09/11**

#25745

SEVERSON, Justice

[¶1.] Christopher Brian Fisher was convicted of manslaughter following the death of a fifteen-month-old child. He appeals, raising the following issues: (1) Whether the trial court erred in failing to suppress incriminating statements Fisher made during an interview with law enforcement; (2) Whether the trial court erred in admitting a portion of a videotaped interrogation where Fisher is depicted shaking a doll with the image of the doll redacted; (3) Whether the trial court erred in finding that Dr. Nancy Free, one of the state's expert witnesses, was qualified to testify about abusive head trauma. We affirm.

**Background**

[¶2.] On November 25, 2008, Fisher moved into a mobile home with his girlfriend, Amanda Vensand. Amanda was the mother of two children, eight-year-old S.V. and fifteen-month-old P.V. On the night of November 26, 2008, Fisher agreed to supervise Amanda's two children while Amanda went out with her friends. Fisher had known Amanda's children for approximately one month but had not taken care of them alone for an entire night.

[¶3.] A little before 5:00 a.m., Fisher awoke to a coughing or choking sound coming from P.V. He noticed that P.V. was not responding and was barely breathing. Fisher attempted to contact both his sister and Amanda. When he was unable to reach them, Fisher called 911. Paramedics and police personnel arrived shortly thereafter and transported P.V. to Avera McKennan hospital. Despite repeated attempts at resuscitation, P.V. was pronounced dead at 6:07 a.m.

[¶4.]     That same morning, Fisher was taken to the law enforcement center to be interviewed by Detective Bakke. The interview began with Detective Bakke reading Fisher his *Miranda* rights, which Fisher waived. Detective Bakke then asked Fisher how P.V. behaved over the last forty-eight hours. Fisher explained that P.V. fell while roughhousing with older boys the day before. Fisher also stated that P.V. was battling a "bug" and vomited on himself when Fisher was putting him to bed. While Fisher was giving him a bath, P.V. fell in the bathtub and hit his head on a toy boat. Fisher suggested that these accidents may have caused P.V.'s injuries.

[¶5.]     At 9:43 a.m., an hour into the interrogation, Detective Bakke took a twelve-minute break. At 9:55 a.m., Detective Bakke returned to the interrogation room and informed Fisher that he spoke with the doctors who treated P.V. Detective Bakke told Fisher these doctors examined P.V.'s eyes and observed retinal hemorrhaging and retinal detachment, which Detective Bakke said was a sign that P.V. was shaken. Detective Bakke also stated that the doctors told him P.V.'s injuries could not have been caused by the accidents Fisher described.

[¶6.]     In actuality, P.V.'s retinas were not detached and Detective Bakke did not speak directly to P.V.'s doctors. Detective Webb, another detective involved with the investigation of P.V.'s death, spoke to the doctor that treated P.V. at the emergency room. Detective Webb also spoke with a doctor who examined P.V.'s body after his death. During a break in the interview with Fisher, Detective Webb told Detective Bakke that the doctors did not believe P.V.'s injuries could have been caused by the accidents Fisher described.

[¶7.]        Fisher continued to insist he never shook P.V. or caused the child any harm. Detective Bakke suggested Fisher take a polygraph examination to confirm his account of the events leading up to P.V.'s death. Fisher agreed. Detective Bakke contacted Detective Walsh to perform the polygraph examination. Fisher was transferred to another interview room containing the polygraph equipment. Detective Walsh provided Fisher with a consent form, which Fisher carefully read before singing. The results of the polygraph test indicated that Fisher was being deceptive.

[¶8.]        After failing the polygraph examination, Fisher told Detective Walsh that he fell while carrying P.V. into the bedroom. Detective Bakke then reentered the room and questioned Fisher about the fall. Upon being questioned by Detective Bakke about the fall, Fisher explained that he actually fell while he was carrying P.V. into the kitchen. Detective Bakke continued to question Fisher's story. Finally, Fisher stated that P.V. fell from the counter of the bathroom sink while Fisher was doing laundry.

[¶9.]        At about 2:15 p.m., Detective Bakke brought a miniature doll into the interrogation room. Detective Bakke gave the doll to Fisher and asked him to demonstrate how he shook P.V. Fisher initially refused but Detective Bakke continued to urge Fisher to take the doll. Fisher eventually took the doll and demonstrated how he held P.V. by the shoulders and shook him. Fisher stated that he shook P.V. approximately four times, and that he could hear P.V.'s teeth clicking together as his head snapped back and forth. Fisher confessed that he shook P.V. because he would not quit crying.

[¶10.]     The interview lasted approximately six hours.  Fisher slept only two to three hours the night before and was emotional during much of the interview.  Fisher did not eat during the interview but was offered beverages.  He was also given cigarette and bathroom breaks.

[¶11.]     Fisher was charged with one count of murder in the second degree and one count of manslaughter in the first degree.  Prior to trial, Fisher filed a motion in limine, seeking to have the video of Fisher's interview with Detective Bakke excluded from evidence.  The court allowed the video of the interview to be admitted, provided that the image of the doll was redacted.

[¶12.]     Fisher also filed a *Daubert* motion in which he asserted Dr. Nancy Free, one of the State's expert witnesses, was not qualified to testify regarding her opinion of the cause of P.V.'s injuries.  Dr. Free is a board certified pediatric physician associated with Child's Voice, a child advocacy center that evaluates children who may be victims of abuse or neglect.  Dr. Free does not perform autopsies or sign death certificates.  However, she has regularly given opinions based on autopsy reports and has consulted on over 500 cases for Child's Voice.

[¶13.]     After reviewing Dr. Free's qualifications, the trial court determined Dr. Free was qualified to testify regarding the cause of P.V.'s injuries.  At trial, Dr. Free testified that she believed P.V.'s injuries were the result of abusive head trauma, which she described as a set of injuries consistent with non-accidental trauma.  Dr. Free testified that abusive head trauma could result from a sudden impact or from violent shaking.  She further testified that a fall in the bathtub or a fall from a countertop would not have been sufficient to cause P.V.'s injuries.

[¶14.] Fisher's expert, a forensic pathologist named Dr. Janice Ophoven, offered a different opinion. Dr. Ophoven testified that shaking alone could not have caused P.V.'s injury and that the scientific community has questioned whether shaking alone can cause abusive head trauma.

[¶15.] At the conclusion of the trial, the jury found Fisher guilty of manslaughter. He was sentenced to serve sixty years in the South Dakota State Penitentiary.

## DECISION

[¶16.] **1. Whether Fisher's confession to Detective Bakke was voluntary.**

[¶17.] Fisher claims that the confession to Detective Bakke was involuntary and the result of coercion. Accordingly, Fisher argues that the trial court erred in failing to suppress the confession. In reviewing a trial court's ruling on the voluntariness of a confession, "'we consider the totality of the circumstances, giving deference to the trial court's factual findings, but performing a de novo review of the record. . . .'" *State v. Carothers,* 2006 S.D. 100, ¶ 23, 724 N.W.2d 610, 619 (quoting *State v. Tofani,* 2006 S.D. 63, ¶ 30, 719 N.W.2d 391, 399). However, the ultimate issue of whether the confession was voluntary is a legal question which we review de novo. *State v. Ralios,* 2010 S.D. 43, ¶ 24, 783 N.W.2d 647, 655 (citing *State v. Tuttle,* 2002 S.D. 94, ¶ 20, 650 N.W.2d 20, 30).

[¶18.] "The State has the burden to prove by a preponderance of the evidence that a defendant's admissions were voluntary." *Id.* (citing *Tuttle,* 2002 S.D. 94, ¶ 21, 650 N.W.2d at 30). In analyzing whether the state has met its burden of establishing voluntariness, we examine:

> (1) the conduct of law enforcement officials in creating pressure
> and (2) the suspect's capacity to resist that pressure. On the
> latter factor, we examine such concerns as the defendant's age;
> level of education and intelligence; the presence or absence of
> any advice to the defendant on constitutional rights; the length
> of detention; the repeated and prolonged nature of the
> questioning; the use of psychological pressure or physical
> punishment, such as deprivation of food or sleep; and the
> defendant's prior experience with law enforcement officers and
> the courts. Finally, [d]eception or misrepresentation by the
> officer receiving the statement may also be factors for the trial
> court to consider; however, the police may use some
> psychological tactics in interrogating a suspect.

*State v. Wright*, 2009 S.D. 51, ¶ 33, 768 N.W.2d 512, 524 (quoting *State v. Cottier,* 2008 S.D. 79, ¶ 19, 755 N.W.2d 120, 129).

[¶19.]     The presence or absence of one of the above referenced factors is not dispositive. *State v. Morato*, 2000 S.D. 149, ¶ 13, 619 N.W.2d 655, 660. "Ultimately, 'the voluntariness of a confession depends on the absence of police overreaching. . . . Confessions are not deemed voluntary if, in light of the totality of the circumstances, law enforcement officers have overborne the defendant's will.'" *Wright,* 2009 S.D. 51, ¶ 32, 768 N.W.2d at 524 (quoting *Cottier,* 2008 S.D. 79, ¶ 19, 755 N.W.2d at 128). "A defendant's will is overborne, making a statement involuntary, when interrogation tactics and statements are so manipulative or coercive as to deprive a defendant of the 'ability to make an unconstrained, autonomous decision to confess.'" *Morato*, 2000 S.D. 149, ¶ 12, 619 N.W.2d at 660 (quoting *State v. Gesinger*, 1997 S.D. 6, ¶ 12, 559 N.W.2d 549, 551).

[¶20.]     The trial court determined the interrogation tactics employed by law enforcement in this case did not deprive Fisher of his capacity to make an unconstrained and autonomous choice to confess. In making this determination,

the trial court made several findings of fact which are supported by the record. These findings include the following: (1) Fisher was 26 years old at the time of the interrogation; (2) Fisher had previous experience with the criminal justice system, having been convicted of two prior felonies; (3) Fisher had received a General Educational Development (GED) diploma and was enrolled in college courses at the time of the interrogation; (4) Fisher had unrestricted use of his cell phone during almost the entire interrogation; (5) Fisher did not eat during the interrogation but was offered drinks, coffee and cigarettes and was allowed several bathroom breaks; (6) Law enforcement did not place restraints on Fisher and did not use threats to elicit a confession.

[¶21.] The trial court also noted that before the interview began, Fisher was read his *Miranda* rights. He was again informed of those rights prior to taking the polygraph examination. Yet at no time during the interview did Fisher request to speak with an attorney or invoke his right to remain silent.

[¶22.] Fisher argues that his confession is invalid because the interview lasted approximately six hours and he slept only two to three hours the night before. Fisher also emphasizes that he was emotional throughout much of the interview. However, the evidence does not show these factors affected Fisher's ability to make an "'unconstrained, autonomous decision to confess.'" *Id.* (quoting *Gesinger*, 1997 S.D. 6, ¶ 12, 559 N.W.2d at 551). *See State v. Anderson*, 2000 S.D. 45, 608 N.W.2d 644 (finding that, under a totality of the circumstances, the defendant's confession was voluntary despite the fact that the detention lasted approximately eight hours and the defendant slept only two hours the night before);

*State v. Jenner*, 451 N.W.2d 710, 717 (S.D. 1990) (recognizing that "mere emotionalism does not necessarily invalidate a confession"). As the trial court noted in its findings, Fisher was alert and responsive during questioning. He was not under the influence of drugs or alcohol. In responding to Detective Bakke's questions, Fisher was able to offer several alternative explanations for P.V.'s injuries. He described these explanations in great detail. In addition, when Fisher was presented with the polygraph consent form, he carefully read the form and asked questions for clarification. These factors support the trial court's determination that Fisher's confession was voluntary and that his will was not overborne by law enforcement's interrogation techniques.

[¶23.] Fisher argues that Detective Bakke improperly used the polygraph examination as a means to coerce Fisher into confessing. However, we have recognized the coercive impact of a polygraph examination may be mitigated or eliminated by advising the defendant of his or her constitutional rights prior to administering the examination. For example, in *State v. DuBois*, we held that incriminating statements made by the defendant after a polygraph examination were voluntary because the defendant had been advised of his *Miranda* rights. 286 N.W.2d 801, 805 (S.D. 1979). Likewise, in *State v. Adkins*, we held that statements a defendant made during and after a polygraph examination were voluntarily because the defendant was advised of his *Miranda* rights and had signed a written consent form prior to taking the test. 225 N.W.2d 598, 573-74 (S.D. 1975).

[¶24.] Fisher was read his *Miranda* rights before the interview began. He also signed a consent form prior to taking the polygraph examination. This consent

form advised Fisher of his constitutional rights and informed him that taking the polygraph examination was not mandatory. Detective Walsh also verbally informed Fisher he was not obligated to take the polygraph examination. After reviewing the voluntariness of the confession based on a totality of the circumstances, we hold that the polygraph examination alone did not render Fisher's subsequent confession involuntary.

[¶25.] Fisher also contends Detective Bakke used deception to coerce Fisher into confessing. During the interview, Detective Bakke repeatedly told Fisher he spoke with the doctors who treated P.V. and these doctors told Detective Bakke falling or roughhousing could not cause P.V.'s injuries. Detective Bakke also told Fisher the doctors examined P.V.'s eyes and observed retinal detachment, which is a sign that P.V. was shaken. In fact, P.V.'s retinas were intact and Detective Bakke did not personally speak with P.V.'s treating doctors. Instead, Detective Webb spoke to the doctors who treated and examined P.V.

[¶26.] Although we have recognized that "[d]eception or misrepresentation by the officer receiving the statement may [ ] be factors for the trial court to consider," we have emphasized, "the police may use some psychological tactics in interrogating a suspect." *State v. Darby*, 1996 S.D. 127, ¶ 31, 556 N.W.2d 311, 320 (citing *Jenner*, 451 N.W.2d at 719). Psychological tactics such as deception or misrepresentation do not prevent a finding of voluntariness so long as the confession is "'a product of the suspect's own balancing of competing considerations.'" *Id.* (quoting *State v. Dickey*, 459 N.W.2d 445, 447 (S.D. 1990)).

[¶27.]     We have reviewed the videotaped interview and find that the misrepresentations Detective Bakke made to Fisher did not deprive Fisher of his capacity to balance competing considerations and make "'an unconstrained, autonomous decision to confess.'" *Morato*, 2000 S.D. 149, ¶ 12, 619 N.W.2d at 660 (quoting *Gesinger*, 1997 S.D. 6, ¶ 12, 559 N.W.2d at 550). Fisher earned a GED and was enrolled in college courses at the time of the interview. Fisher also had previous experience with law enforcement. He was informed of his constitutional rights on two separate occasions. Fisher indicated he understood his constitutional rights and elected to continue the interview. He never asked to terminate the interview or speak with an attorney.

[¶28.]     Although the misrepresentations of Detective Bakke likely factored into Fisher's decision to confess, we do not think his will was overcome so as to render the confession involuntary. Throughout the interview, Fisher demonstrated a capacity to resist the pressures imposed on him by law enforcement. Fisher was able to offer several alternative explanations for P.V.'s injuries and death. In addition, after Fisher admitted to shaking P.V., Detective Bakke told Fisher there were bruises on P.V.'s face. Detective Bakke asked Fisher if he ever hit or slapped P.V. Fisher denied ever hitting or slapping P.V., indicating that his will was not overborne by Detective Bakke's misrepresentations.

[¶29.]     The totality of the circumstances surrounding the interrogation supports the trial court's conclusion that Fisher made an unconstrained and autonomous decision to confess after weighing competing considerations. *Id*. We thus hold the trial court did not err in denying Fisher's motion to suppress.

**[¶30.]    2.    Whether the trial court erred in admitting the redacted video of Fisher shaking a doll.**

[¶31.]    Fisher argues the trial court erred in admitting into evidence the portion of the videotaped interrogation where Fisher was shown shaking a doll. Although the image of the doll was redacted, the jury was able to observe Fisher's motions and the force he used to shake the doll. Fisher contends this evidence was overly prejudicial.

[¶32.]    We review a trial court's evidentiary rulings under an abuse of discretion standard. *State v. Krebs*, 2006 S.D. 43, ¶26, 714 N.W.2d 91, 101. "'An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence.'" *Id.* (quoting *State v. Moriarty,* 501 N.W.2d 352, 355 (S.D. 1993)). Even if a trial court's evidentiary ruling is erroneous, the error must be prejudicial in nature before we will overturn the ruling. *State v. Mattson*, 2005 S.D. 71, ¶ 13, 698 N.W.2d 538, 544 (citing *Novak v. McEldowney*, 2002 S.D. 162, ¶ 7, 655 N.W.2d 909, 912). "'Error is prejudicial when, in all probability . . . it produced some effect upon the final result and affected rights of the party assigning it.'" *Id.* (quoting *Novak,* 2002 S.D. 162, ¶ 7, 655 N.W.2d at 912).

[¶33.]    The factual relevance of evidence is determined under SDCL 19-12-1 (FRE 401), which provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Under SDCL 19-12-3 (FRE 403), relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading to the jury . . . ." "'To cause unfair prejudice, the evidence must persuade the jury in an unfair and illegitimate way.'" *St. John v. Peterson*, 2011 S.D. 58, ¶ 16, 804 N.W.2d 71, 76 (quoting *Novak*, 2002 S.D. 162, ¶ 11, 655 N.W.2d at 913). The party objecting to the admission of evidence has the burden of showing the probative value of the evidence is substantially outweighed by its prejudicial effect. *Id.* (quoting *Novak,* 2002 S.D. 162, ¶ 56, 655 N.W.2d at 913).

[¶34.]    Fisher argues the video of him shaking the doll is a form of demonstrative evidence. We have held that "[d]emonstrative evidence must be relevant, probative and nearly identical." *Sommervold v. Grevlos*, 518 N.W.2d 733, 737 (S.D. 1994) (citing *State v. Jenkins*, 260 N.W.2d 509, 511 (S.D. 1977); *State v. Bradley*, 431 N.W.2d 317, 325 (S.D. 1988)). However, "conditions can seldom be duplicated exactly." *Id.* When deciding whether to permit courtroom demonstrations, the trial court considers the following threshold fact questions: "(1) is the evidence relevant, (2) does it have probative value, and (3) is the recreation of conditions so dissimilar to the original event that, even after effective highlighting of the dissimilarities, the demonstration would be misleading to the jury." *Jenkins*, 260 N.W.2d at 511.

[¶35.]    Fisher notes the weight and length of the doll Fisher shook in the redacted video was different from the actual weight and length of P.V. The doll weighed approximately nine ounces and was approximately eighteen inches long. In contrast, P.V. weighed approximately twenty-six pounds and was approximately twenty-one and a half inches long. Thus, Fisher contends the depiction of Fisher

shaking the doll was not an accurate or nearly identical reenactment of the act in question.

[¶36.]        Fisher cites *United States v. Gaskell* in support of his argument. 985 F.2d 1056 (11th Cir. 1993). In *Gaskell*, a prosecution expert was given a rubber infant mannequin and asked to demonstrate the motion and force necessary to cause shaken baby syndrome. *Id.* at 1059. The expert shook the mannequin, causing its head to swing back and forth. *Id.* However, because of differences in the weight and composition of the mannequin, the expert testified he had to use more force to shake it than would have been necessary to shake an actual infant. *Id.* Moreover, the expert was unable to define the number of oscillations necessary to cause shaken baby syndrome. *Id.* at 1061. The *Gaskell* court concluded the conditions of the demonstration were "substantially *dissimilar*" and that "the government failed to establish that either the degree of force or the number of oscillations bore any relationship to the defendant's actions." *Id.* Thus, the *Gaskell* court held the probative value of the demonstration was substantially outweighed by its prejudicial effect. *Id.*

[¶37.]        The facts of this case are distinguishable from *Gaskell*. Here, Fisher was not demonstrating the force necessary to cause P.V.'s injuries. Rather, Fisher was demonstrating the manner in which he actually shook P.V. The demonstration was based on Fisher's own personal knowledge of the events that took place the night P.V. died. *See Moore v. State of Texas*, 154 S.W.3d 703, 708 (Tex. App. 2004) (holding a defendant's use of a doll during cross examination to demonstrate how he handled a child was a fair comparison to the act in question because the defendant

was demonstrating his own conduct). In addition, Fisher was given ample opportunity to introduce evidence at trial regarding the differences between the size and weight of P.V. as compared to the doll. *See State v. Candela*, 929 S.W.2d 852, 867 (Mo. App. E.D. 1996) (holding the trial court did not err in allowing a physician to shake a rag doll to illustrate the type of shaking generally involved in shaken impact syndrome and noting the defendant was given an opportunity to show the dissimilarity between the doll and the child at trial).

[¶38.] Because Fisher was recreating events based on his own personal knowledge, any dissimilarity between the motion Fisher used to shake the doll compared to the motion used to shake P.V. would have been slight and insufficient to mislead the jury or unfairly prejudice Fisher. *See* SDCL 19-12-3. We therefore hold the trial court did not err in admitting the redacted video of Fisher shaking the doll.

[¶39.] **3.** **Whether the trial court erred in finding Dr. Free was qualified to testify regarding the cause of P.V.'s death.**

[¶40.] Fisher argues that Dr. Free lacked the qualifications necessary to testify as an expert witness regarding the cause of P.V.'s injuries and death because Dr. Free is not a pathologist and has never performed an autopsy or signed a death certificate. The admissibility of expert testimony is governed by SDCL 19-15-2 (FRE 702), which provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data,

> (2) The testimony is the product of reliable principles and methods, and
> (3) The witness has applied the principles and methods reliably to the facts of the case.

[¶41.]     Under SDCL 19-15-2, a witness must be "qualified" to testify as an expert. *State v. Lemler,* 2009 S.D. 86, ¶ 18, 774 N.W.2d 272, 278 (citing *Klutman v. Sioux Falls Storm,* 2009 S.D. 55, ¶ 21, 769 N.W.2d 440, 449). "'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *Id*. (quoting *Maroney v. Aman,* 1997 S.D. 73, ¶ 39, 565 N.W.2d 70, 79).

[¶42.]     "We review a trial court's 'decision to admit or deny an expert's testimony under the abuse of discretion standard.'" *Id*. (quoting *Burley v. Kytec Innovative Sports Equip., Inc.,* 2007 S.D. 82, ¶ 12, 737 N.W.2d 397, 402). "This court has consistently held that the trial judge has the discretionary power to determine whether a witness is an expert witness. As such, his ruling will not be disturbed 'unless there is no evidence that the witness had the qualifications of an expert or the trial court has proceeded upon erroneous standards.'" *State v. Edmundson,* 379 N.W.2d 835, 839 (S.D. 1985) (quoting *State ex rel. Helgerson v. Riiff,* 73 S.D. 467, 475, 44 N.W.2d 126, 139 (1950)).

[¶43.]     In this case, the evidence supports the trial court's conclusion that Dr. Free had the expert qualifications necessary to testify as to P.V.'s cause of death. Dr. Free attended medical school at Texas College of Osteopathic Medicine. She is board certified in general pediatrics and has been in practice for over twenty years. Dr. Free testified that she has consulted on over 500 cases while working for Child's

Voice and has regularly assessed autopsy reports and given opinions on those assessments. Dr. Free also testified that she attended the International Conference on Abusive Head Trauma in 2008 and has attended conferences and sessions on evaluating children after death.

[¶44.] The evidence in the record supports the trial court's conclusion that Dr. Free had sufficient "knowledge, skill, experience, training, or education" to offer her opinion on P.V.'s cause of death. *See* SDCL 19-15-2. The fact that Dr. Free is not a pathologist and has not performed an autopsy or signed a death certificate may bear on the weight of her testimony, but it does not render her testimony inadmissible. We therefore hold the trial court did not abuse its discretion in allowing Dr. Free to testify regarding the cause of P.V.'s death.

[¶45.] Affirmed.

[¶46.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and WILBUR, Justices, concur.