#28029-aff in pt & rev in pt-SLZ
**2018 S.D. 21**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

JONATHAN CHARLES WILLS,                   Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JON R. ERICKSON
Judge

* * * *

MARTY J. JACKLEY
Attorney General

CULLEN P. MCNEECE
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                 and appellee.

AARON P. PILCHER
Rapid City, South Dakota                  Attorney for defendant
                                 and appellant.

* * * *

CONSIDERED ON BRIEFS
JANUARY 8, 2018
OPINION FILED **02/28/18**

ZINTER, Justice

[¶1.] Jonathan Wills was convicted of first-degree rape and sexual contact with a child under sixteen. He appeals, challenging the circuit court's rulings (1) permitting his impeachment with inconsistent statements he made to law enforcement in a prior, unrelated criminal investigation, and (2) precluding his expert witness from testifying about the methods used by the forensic interviewer who interviewed the child. We affirm the impeachment ruling, reverse the expert disqualification ruling, and remand for new trial.

## Facts and Procedural History

[¶2.] Wills lived with his girlfriend Lisa Trebelcock and Trebelcock's three children, E.G., A.G., and R.T. Shortly after Wills and Trebelcock's relationship ended, Trebelcock reported Wills for sexual abuse of E.G. Law enforcement scheduled E.G. for a forensic interview at Child's Voice, a child advocacy center.

[¶3.] Robyn Niewenhuis, a social worker trained in the CornerHouse protocol of forensic interviewing, conducted the interview. E.G. told Niewenhuis that Wills had sexually abused her. E.G. stated that on multiple occasions, Wills touched and rubbed the inside of her vaginal area. E.G. also stated that on another occasion, Wills had her rub his penis until "white stuff" came out.

[¶4.] Wills was indicted for first degree rape and sexual contact with a child under sixteen. E.G. testified to the events at trial. The State also called Niewenhuis as an expert witness on forensic interviews. Niewenhuis explained the CornerHouse protocol for forensic interviewing of sexually abused children and how she utilized her training when interviewing E.G. The jury was also shown a video

of the interview. Niewenhuis testified that she saw no "red flags" in the child's description of the abuse.

[¶5.]    Wills called Dr. Sarah Flynn, a forensic psychiatrist, to point out a number of alleged weaknesses in Niewenhuis's interview. Dr. Flynn specialized in several areas of psychiatry, including psychiatry relating to children and adolescents. The circuit court, however, ruled that Dr. Flynn was not qualified to give an expert opinion because she was not sufficiently familiar with the CornerHouse protocol.

[¶6.]    Wills testified in his own defense. He denied ever touching E.G. He also alleged that Trebelcock "set up" the allegations to obtain custody of the children. On cross-examination, he also denied having an attraction to and sexual curiosity about young girls:

> Q:    Are you attracted to younger girls?
> A:    No.
> Q:    Do you have a curiosity about them sexually?
> A:    No.
> Q:    Did you ever have a curiosity about them sexually?
> A:    No.

Following these denials, the State attempted to impeach Wills's claims with inconsistent statements he had made to law enforcement during a prior, unrelated child pornography investigation. Wills objected, and the court held a hearing outside the presence of the jury.

[¶7.]    The State argued that because Wills denied touching E.G. and because he denied an attraction to and sexual curiosity about young girls, it could use the

prior inconsistent statements to impeach Wills's trial testimony.[1] Although the statements had been reported in a Division of Criminal Investigation report, the agent who had prepared the report was not then available to testify. The State informed the circuit court that it could produce an agent who was present at the interview if Wills denied making the statements and if the State needed to prove the statements in rebuttal. Wills argued the impeachment evidence was unduly prejudicial because it would suggest to the jury that Wills had unlawfully possessed child pornography even though the prior charges had been dismissed.[2] The circuit court ruled that Wills's prior statements could be used to impeach his trial testimony and that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice.

[¶8.] The jury returned, and the State resumed its cross-examination of Wills. The State asked two foundational questions concerning the interview in which Wills allegedly made the statements.

> Q: What was the purpose of the interview. Why was [the DCI agent] interviewing you?
>
> A: I was accused of a crime so he was interviewing me.
>
> Q: And that crime had something to do with child pornography, didn't it?
>
> A: Yes.

---

1. The State gave Wills advance notice that it planned to introduce this evidence if Wills chose to testify.

2. The charges were ultimately dismissed because the age of the individuals depicted in the images could not be verified.

Wills initially indicated he could not remember what was said in the interview. The State then refreshed his recollection by showing him the agent's report.[3] After reviewing the report, Wills testified that the agent's account of the interview was not accurate. The State and Wills then engaged in a colloquy in which Wills explained his statements.

> Q: You never used the words, which [the agent] used in quotation marks, had a curiosity?
>
> . . . .
>
> A: Yeah, I see—it's here underneath where you have it highlighted. It said using windows files sharing downloading pornography, his—he discovered some video files depicting bestiality. These that you have highlighted were in reference to our interview to the bestiality not in child pornography.
>
> Q: Your curiosity you say was about bestiality?
>
> A: Yes, sir. So these are completely out of context.
>
> Q: And the next paragraph where he said Wills told me it was not his intention to create or distribute child pornography. His intent was to simply see—again, in quotation marks, what was out there—to see what was out there, end quotation mark. And you're disputing that you ever made that statement?
>
> A: That was no reference to child pornography at all.
>
> Q: It was in reference to bestiality?
>
> A: Yes, when he mentioned child pornography, I told him if there was any on the computer, I wasn't aware of that. That's what I told him.
>
> Q: You agree that's not what [the agent] says?
>
> A: If he wrote that, then that's what he said, then obviously that's what he's saying I said.

On redirect, Wills's attorney did not ask any follow-up questions regarding Wills's prior statements.

---

3. The report itself was not introduced into evidence.

[¶9.]    On the next day of trial, the State announced that it would not call an agent in rebuttal to further pursue the impeachment.  The State explained that it believed Wills had been properly impeached with prior inconsistent statements.  Wills objected and moved for a mistrial.  He contended that the statements had only been admitted on the condition that an agent would testify about the statements in the report.  The circuit court disagreed that it had only allowed conditional impeachment, and it denied the motion.

[¶10.]    The jury found Wills guilty of both counts.  He now appeals, and we restate the issues as follows:

1.  Whether the circuit court erred in permitting Wills's impeachment?

2.  Whether the State's attempted impeachment constituted prosecutorial misconduct?

3.  Whether the circuit court erred in ruling that Wills's expert did not meet the requirements to qualify as an expert witness under SDCL 19-19-702?

**Decision**

*Impeachment*

[¶11.]    Wills raises a number of arguments related to the State's impeachment.  He first argues that the impeachment involved "the out-of-court testimony of [the agent]" who was not available to testify.  He contends that because the State did not produce the agent to prove up the inconsistent statements, Wills was denied his constitutional right to confront and cross-examine the witnesses against him.  Wills relies on language in *State v. Johnson* indicating that "[i]n *Crawford,* the United States Supreme Court held that [the Confrontation Clause] bars 'admission of testimonial statements of a witness who did not appear at trial

unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination.'" *State v. Johnson*, 2009 S.D. 67, ¶ 18, 771 N.W.2d 360, 368 (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 1365, 158 L. Ed. 2d 177 (2004)).

[¶12.] However, Wills was not impeached by the out-of-court hearsay statements of the interviewing agent.[4] He was impeached with his own prior statements under SDCL 19-19-613. Further, his prior statements suggested an attraction to and sexual curiosity about young girls, a position that was inconsistent with his testimony at trial. Because the prior statements were only introduced for impeachment, they were not hearsay, i.e. statements introduced to prove that Wills was attracted to and sexually curious about young girls. *See* SDCL 19-19-801(c) (defining hearsay as an out-of-court statement used "to prove the truth of the matter asserted in the statement"); *see also United States v. Mergen*, 543 Fed. Appx.

---

4.      Wills likens his case to *Douglas v. Alabama*, 380 U.S. 415, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965), where the Supreme Court ruled the defendant's confrontation rights were violated when the prosecutor read an accomplice's confession into evidence. However, *Douglas* is distinguishable. First, the accomplice's confession, which implicated the defendant, was read to the jury after the accomplice refused to testify and refused to admit that the statements were his. Because the accomplice refused to testify, the defendant was unable to cross-examine him, and the Court concluded the statements would appear as substantive evidence. *See id.* at 419, 85 S. Ct. at 1077 (noting that although the statements "were not technically testimony, the [prosecutor's] reading may well have been the equivalent in the jury's mind of testimony that [the accomplice] in fact made the statement" and that the accomplice's refusal to testify "created a situation in which the jury might improperly infer both that the statement had been made and that it was true"). Second, the statements implicating the defendant were made by another person. Here, however, the statements were made by Wills, and he admitted to making them. Also, Wills's statements were not introduced as substantive evidence but instead were used to impeach his inconsistent trial testimony.

46, 49 (2d Cir. 2013) ("[P]rior inconsistent statements offered for impeachment are, by definition, not hearsay.").  Indeed, the jury was instructed that it could consider Wills's prior statements to determine his credibility but not to prove any fact contained in the statements.  Because the Confrontation Clause only applies to testimonial hearsay statements "made for the purpose of establishing or proving some fact," s*ee Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364, Wills has no *Crawford* claim here.  The use of a defendant's own prior statements to impeach does not implicate the Confrontation Clause.

[¶13.]      Wills next argues the State's failure to call the agent to testify and prove up the prior statements was improper impeachment.  We disagree.  SDCL 19-19-613 governs impeachment by prior inconsistent statements.  To properly impeach, the prior statement must be inconsistent with the witness's current testimony and it must not be on a collateral issue.  *See State v. Thomas*, 381 N.W.2d 232, 238 (S.D. 1986).  The examiner may ask the witness whether he or she made the statement without disclosing its contents to the witness.  SDCL 19-19-613(a).  However, the examiner must disclose its contents to the opposing party's attorney on request.  *Id.*  If the witness admits making the statement, no further foundation is necessary.  If the witness denies making the statement, the examiner is permitted to prove that the witness made the inconsistent statement by extrinsic evidence.  SDCL 19-19-613(b); *United States v. Marks*, 816 F.2d 1207, 1210-11 (7th Cir. 1987).  However, the examiner is not obligated to introduce extrinsic evidence.  *See Marks*, 816 F.2d at 1211.  The examiner may choose to rely only on the witness's explanation.

[¶14.] In this case, Wills denied touching E.G., and he testified that he was neither attracted to young girls nor curious about young girls sexually. But in the prior interview with the DCI agent, Wills had made statements indicating he had a curiosity regarding child pornography. The circuit court determined the prior statements were inconsistent with his current testimony, and Wills has not appealed that determination. After initially claiming an inability to recall making the statements, the State refreshed Wills's recollection with the actual report. Wills then admitted making statements but claimed that the statements in the report were taken out of context: he claimed his interest was in bestiality rather than child pornography. At that point, Wills's own explanation of the statements provided a foundation for the statements, and the State was not obligated to further prove the statements by calling the agent who had heard the statements. Accordingly, the State's impeachment was proper.

[¶15.] Wills next argues that the State's impeachment included inadmissible evidence of character within the meaning of SDCL 19-19-404(b). He also contends the evidence of his interest in child pornography was unduly prejudicial. *See* SDCL 19-19-403. Wills contends the "young girls" depicted in the pornography case were not sufficiently similar to E.G. to qualify for the Rule 404(b) identity exception involving prior acts disclosing a modus operandi.

[¶16.] We need not address this factual argument regarding identity because impeachment by prior inconsistent statements is an additional, recognized exception to SDCL 19-19-404(b)'s general limitation on the use of prior acts evidence. *See, e.g.*, *United States v. Bell*, 624 F.3d 803, 810-11 (7th Cir. 2010);

*United States v. Cerno*, 529 F.3d 926, 936 (10th Cir. 2008); *United States v. Gay*, 967 F.2d 322, 328 (9th Cir. 1992); *United States v. Stockton*, 788 F.2d 210, 219 n.15 (4th Cir. 1986) ("Although impeachment of a witness is not among the 'other purposes' explicitly listed in Rule 404(b) by way of example, that list is not exhaustive, and impeachment qualifies as a permissible purpose for the introduction of other crimes.").

[¶17.]    The circuit court also determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* SDCL 19-19-403. The court acknowledged the potential prejudice from mentioning the pornography allegations but concluded the evidence was highly probative of Wills's credibility once he testified he was not attracted to young girls. Considering the nature of this case—which depended heavily on the credibility of the witnesses and the weight given to their testimony—we cannot say that the court's determination was "a fundamental error of judgment, a choice outside the range of permissible choices, [or] a decision, which, on full consideration, is arbitrary or unreasonable." *State v. Birdshead*, 2015 S.D. 77, ¶ 51, 871 N.W.2d 62, 79.

*Prosecutorial Misconduct*

[¶18.]    Wills argues the State's impeachment constituted prosecutorial misconduct. Wills repeats his improper impeachment arguments. He also points out that the child pornography charges were ultimately dismissed because of an inability to prove the age of the individuals depicted in the images. He contends that under the circumstances, the State should not have impeached without calling an agent who was present at the interview to testify about the prior statements.

Wills contends that impeachment under these circumstances was a dishonest act reflecting an attempt to persuade by deception and reprehensible methods. Wills acknowledges he did not raise this issue below and concedes that our review is limited to plain error. *See State v. Janis*, 2016 S.D. 43, ¶ 21, 880 N.W.2d 76, 81.

[¶19.] Wills has failed to demonstrate any error here. First, as we have previously explained, Wills was not deprived of his confrontation rights. Second, he has failed to identify evidence suggesting misconduct. There is no dispute that the impeachment questions were based on actual statements Wills made in the prior child pornography investigation. The dispute at trial was what Wills meant by them. Further, the State did not promise it would call an agent to testify. Rather, the State informed the court and defense counsel that it *could* call an agent to testify if Wills denied making the statements and if it *chose* to present a rebuttal. Ultimately, Wills admitted that the interview occurred but claimed the statements were recorded out of context. Under these circumstances, the State had no obligation to call a witness to further pursue or prove the inconsistent statements. *See supra* ¶ 13. No further foundational evidence was necessary.

*Expert Testimony*

[¶20.] At trial, the State called Niewenhuis as an expert witness. Niewenhuis has a bachelor's degree in human development and family studies, and a master's degree in social work. She completed a one-week-training course in the CornerHouse protocol of forensic interviewing. The CornerHouse protocol is a nationally recognized and research-based method for conducting forensic interviews of children and adolescents. Niewenhuis, who had conducted more than 480

forensic interviews, explained that forensic interviewing requires maintaining a neutral position to get the child to tell the story in his or her own words. Niewenhuis noted that interviewers try to use open-ended questions and avoid leading or suggestive questions. In this case, Niewenhuis testified that she did not "have any flags—red flags" about E.G.'s interview.

[¶21.] Wills called Dr. Flynn to rebut this testimony and to critique some of Niewenhuis's questions in conducting her interview. Dr. Flynn completed residencies in preliminary internal medicine and adult psychiatry, and she completed fellowships in child and adolescent psychiatry and forensic psychiatry. She is board certified in adult, child, and adolescent psychiatry, and she is employed as a forensic psychiatrist at Avera Group University Psychiatry. Dr. Flynn testified that she was trained according to the National Institute of Child Health and Human Development (NICHD) method of forensic interviewing, which is also research based and nationally recognized. She admitted that she had conducted only one forensic interview in her career. But she explained that forensic psychiatrists are trained to review interviews and give an opinion on the quality of the interview rather than personally conduct interviews. She also admitted that she had never conducted an interview using the CornerHouse protocol. However, she stated that she was familiar with it based on research and literature she had read.

[¶22.] The State objected to Dr. Flynn's proposed testimony. Outside the presence of the jury, Dr. Flynn informed the court that she was prepared to testify about certain issues with Niewenhuis's interview of E.G. Specifically, she would

testify that Niewenhuis asked questions repeatedly and in a way that suggested bias. She also planned to explain that at one point in the interview, E.G. appeared to attempt to recant a statement and that Niewenhuis failed to ask any follow-up questions, which would impeach Niewenhuis's "no red flag" testimony.

[¶23.]     The circuit court focused on Dr. Flynn's lack of experience with the CornerHouse protocol. Because that was the protocol Niewenhuis used, the court characterized Dr. Flynn's proposed critique of Niewenhuis's interview as "rank speculation" that was not sufficiently reliable to meet the standards set forth in SDCL 19-19-702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[¶24.]     Admissibility of expert testimony is governed by SDCL 19-19-702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles or methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or

education with the subject matter of the witness's testimony." *State v. Fisher*, 2011 S.D. 74, ¶ 41, 805 N.W.2d 571, 580.[5]

[¶25.]     A comparison of that evidence in this case reflects that the circuit court misapplied the *Daubert* standards.  Dr. Flynn was clearly qualified as an expert and her proposed testimony was sufficiently reliable.  She had extensive education, training, knowledge, and experience in child psychiatry and forensic interviewing. She was trained in forensic interviewing and agreed with Niewenhuis on general principles such as being neutral and avoiding leading or suggestive questions. Although she acknowledged a lack of detailed familiarity with the CornerHouse protocol, she preferred a different nationally recognized protocol (the NICHD protocol) because in her opinion, it was supported by more research.  Moreover, she explained that her objections involved Niewenhuis's purported violation of common principles and methods such as avoiding leading questions.  Dr. Flynn's proposed testimony was limited to critiquing specific issues regarding the methods and procedures used by Niewenhuis under these generally accepted principles of forensic interviewing.

[¶26.]     The *Daubert* question here did not involve Dr. Flynn's lack of expertise or an attempt to speculatively apply the CornerHouse protocols.  Both witnesses were qualified experts, and both agreed with the basic principles of child forensic interviewing.  The dispute focused on the experts' conflicting opinions regarding application of those common, accepted principles to the facts of this case.  "When

---

5.     We review the decision to admit or deny expert testimony for an abuse of discretion.  *State v. Lemler*, 2009 S.D. 86, ¶ 18, 774 N.W.2d 272, 278.

opposing experts [have] contradictory opinions on the reliability or validity of a conclusion, the issue of reliability becomes a question for the jury." *State v. Guthrie*, 2001 S.D. 61, ¶ 38, 627 N.W.2d 401, 417. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S. Ct. at 2798. Further, Dr. Flynn's lack of familiarity with the CornerHouse protocol and lack of personal experience conducting forensic interviews "may bear on the weight of her testimony, but it [did] not render her testimony inadmissible."[6] *See Fisher*, 2011 S.D. 74, ¶ 44, 805 N.W.2d at 580; *State v. Colburn*, 366 P.3d 258, 262 (Mont. 2016) (concluding that the trial court "too narrowly conceived the subject matter" when it disqualified an expert witness who did not rely on the specific interview protocol used in a forensic interview).

[¶27.] The record in this case establishes that Dr. Flynn was qualified as an expert in child forensic interviews. The record also reflects that Dr. Flynn's specialized knowledge in interviewing children could help the jury evaluate E.G.'s interview; her proposed testimony was based on the specific facts of this case; her proposed testimony was based on reliable principles and methods that both experts shared; and her proposed testimony would apply those accepted principles and methods to the facts of this case. *See* SDCL 19-19-702. The circuit court misapplied

---

6. It also appears that the circuit court was concerned that Dr. Flynn's testimony would reflect on E.G.'s truthfulness. However, Dr. Flynn specifically assured the court that her opinion was limited only to the quality of the interview itself under generally accepted methods for conducting forensic interviews, not whether E.G. was telling the truth.

SDCL 19-19-702 when it excluded Dr. Flynn's testimony because she preferred a different generally accepted protocol than the one used by Niewenhuis. Considering the nature of this case, which is dependent on the weight to be given to witness testimony and expert opinions, the exclusion of this evidence was sufficiently prejudicial to entitle Wills to a new trial. *See State v. Huber*, 2010 S.D. 63, ¶ 37, 789 N.W.2d 283, 295.

## Conclusion

[¶28.]     The circuit court did not err in permitting the State to impeach Wills with his prior inconsistent statements. However, the court did err in excluding Dr. Flynn's testimony. We reverse and remand for a new trial.

[¶29.]     GILBERTSON, Chief Justice, and SEVERSON, KERN, and JENSEN, Justices, concur.