#29002-a-JMK
**2021 S.D. 38**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

HENRY FRANCIS LITTLE LONG,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JON SOGN
Judge

\* \* \* \*

JASON R. RAVNSBORG
Attorney General

JOHN M. STROHMAN
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff and
                                        appellee.


KRISTI JONES of
Dakota Law Firm, Prof. LLC
Sioux Falls, South Dakota                    Attorneys for defendant and
                                        appellant.

\* \* \* \*

ARGUED
APRIL 22, 2020
OPINION FILED **06/23/21**

#29002

KERN, Justice

[¶1.]        A jury convicted Henry Francis Little Long (Little Long) of second-degree murder and first-degree manslaughter for the killing of LaKendrick Thornton (Thornton).  The circuit court sentenced Little Long to life in prison on the second-degree murder conviction.  Little Long appeals, challenging the circuit court's admission of certain statements for impeachment purposes, the State's compliance with the 180-day rule, and the sufficiency of the evidence.  We affirm.

## Facts and Procedural History

[¶2.]        Just before 1:00 a.m. on September 18, 2018, the Sioux Falls Police Department received a call reporting that a woman was pounding on the door of a residence pleading for help.  Law enforcement officers located the woman, Ayom Mangor (Mangor), who told them she had just witnessed a shooting.  Mangor told the officers that earlier that evening she was with Thornton, when they were picked up by Kelsey Roubideaux (Roubideaux), and a Native American man, (later identified as Little Long) who was in the front passenger seat.  Mangor told the officers that she was with Thornton when the couple picked them up to drive Thornton to a location where he could buy drugs.  An argument ensued between the man and Thornton, and Mangor reported that the man in the front passenger seat pulled out a gun, turned to the back seat, and shot Thornton in the chest.

[¶3.]        Panicked, Mangor pushed the rear passenger door open and leapt out of the backseat of the moving car.  She hit the ground, scraping her knees and hands, and losing a shoe in the process.  Despite her best efforts, she was unable to pull Thornton out with her when she jumped.  The shooting occurred near the

-1-

intersection of Nye and Mable in Sioux Falls. Investigators found Thornton's body at about 9:30 a.m. that morning in a ditch near Renner, South Dakota, with a single gunshot wound to the chest. An autopsy later revealed that Thornton died from the wound sometime between midnight and 2:00 a.m. on September 18, 2018.

[¶4.]     Shortly after finding the body, officers identified Little Long as a suspect and began interviewing people acquainted with him. On September 20, Sioux Falls Police Department Detective Pat Mertes (Detective Mertes), conducted a videotaped interview with Margaret Walking Eagle (Walking Eagle), Little Long's mother figure who stated that Little Long had been staying at her house. When questioned about the events that occurred on the night of September 18, she became very emotional. She stated that Little Long and Roubideaux came to her house. Little Long had a gun with him and a pair of red tennis shoes. He asked Walking Eagle to follow him into a back bedroom where he recounted the fight in the car and said that he had "f***ing killed someone tonight." Walking Eagle disclosed to law enforcement that Little Long threatened to kill her if she told anyone.

[¶5.]     Police arrested and interviewed Roubideaux on September 20. She told officers that she borrowed a car from a friend in exchange for drugs.[1] She stated that she picked up Little Long, her former boyfriend, at a casino in Sioux Falls and then drove across town to pick up Thornton, who had agreed to assist them in buying drugs. Thornton got into the back seat of the car with a female friend. Detective Mertes confirmed the information gleaned from Roubideaux's interview by viewing security video footage from a Get-n-Go fuel station, across the

---

1.     The vehicle was a 2001 gold Toyota Camry.

street from the spot where they picked up Thornton, which captured Thornton and Mangor entering the backseat of a Toyota Camry before it drove away.

[¶6.] As they approached the designated address for the drug buy, near east Tenth Street in Sioux Falls, Thornton became paranoid, and a verbal argument broke out in the car. Roubideaux ordered Thornton to get out. After he refused, Little Long brandished a gun and repeated Roubideaux's request to Thornton to get out of the car. After Roubideaux convinced Little Long to put the gun away, Thornton told Little Long that he was "tired of people pulling guns on him and not pulling the trigger." Roubideaux said that Thornton "doubted" Little Long. At trial, Roubideaux testified that Little Long then pulled the trigger, shooting Thornton in the chest, who responded, "you shot me." Roubideaux initially told the police that Little Long dropped her off after the shooting and that she had no further information. Roubideaux subsequently recanted this statement and admitted to assisting Little Long in disposing of Thornton's body and cleaning the car.

[¶7.] Little Long was arrested on September 21, 2018 and charged by complaint with Thornton's murder. His initial appearance occurred that same day. On October 3, 2018, a Minnehaha County grand jury issued a three-count indictment charging Little Long and Roubideaux with first- and second-degree murder and first-degree manslaughter.[2] As the case progressed, a series of pretrial motions and scheduling conflicts delayed the trial.

---

2. Roubideaux, as part of a plea bargain agreement, pled guilty to accessory to murder in connection with Thornton's death and to an aggravated assault charge arising from an unrelated case.

[¶8.] Little Long's seven-day jury trial began on April 8, 2019. The State called both Roubideaux and Mangor as witnesses. As it related to the events that transpired in the car, Roubideaux's testimony was largely identical to her initial interview with police. She testified that after Little Long shot Thornton, Mangor started screaming and jumped out of the car. She asked Little Long if she should take Thornton to the hospital. Little Long said they were not taking him to the hospital and told her to keep driving. Roubideaux testified that they drove to a remote location north of Sioux Falls and that she helped Little Long drag Thornton's body from the car and dump it in the ditch. Both she and Little Long had their cell phones with them, and Little Long used the GPS function to determine their location because they were unfamiliar with the area. At trial, she testified that she did not know what happened to Thornton's phone, but Detective Mertes testified that she told him during the investigation that the phone had been thrown out the window.

[¶9.] Roubideaux also testified that after dumping the body, she drove Little Long to Walking Eagle's house where they stayed for a short time. She then took Little Long to his girlfriend's house where they used bleach and wipes to remove the blood from the interior of the car. She testified that she cleaned up the blood, and Little Long disposed of the remaining items that were left in the car.

[¶10.] Mangor testified that she was with Thornton when Roubideaux, who was driving a gold Camry, picked them up at a friend's house near the intersection of 4th and Cliff. She knew Roubideaux from an earlier meeting with her at the Nites Inn when Mangor was looking for Thornton. Roubideaux had a male

passenger in the front seat, so she and Thornton slid into the back seat with Mangor sitting directly behind the male passenger in the front. An argument broke out in the car which Mangor testified was caused by Roubideaux's inability to follow the directions Thornton was giving her. The man in the front seat pulled out a gun twice. The first time, Mangor testified that he pointed it at her head. The second time he pulled out the gun, she heard Thornton say, "You're not going to keep on waving that gun around. You're just not going to—if you're going to shoot, just shoot." The man replied, "You think I'm not going to shoot?" and then shot Thornton in the chest. Mangor testified that she flew out of the vehicle, leaving a shoe behind on the street.

[¶11.] The State also called several witnesses to the stand to testify about the location and condition of Thornton's body in the ditch where it was discovered. Erin McCaffrey (McCaffrey), a forensic specialist with the Sioux Falls Police Department, testified that she photographed Thornton's body, which was clothed in only a shirt, underwear, and a sock, before crime scene specialists removed the body from the scene. McCaffrey lifted Thornton's shirt and observed a bullet wound to his chest. She testified that she returned later to the scene that evening and applied BlueStar to the area. The BlueStar revealed a trail of blood extending from the road to the place where the body was found in the ditch.[3] McCaffrey also obtained Little Long's fingerprints after his arrest.

---

3. BlueStar is a chemical that reacts with small traces of blood that may not be visible to the naked eye, producing a bright blue chemiluminescence that can be photographed.

[¶12.] Detective Mertes testified that he was called to the scene and, based on the information he had, he obtained an arrest warrant for Roubideaux and disseminated photos of the Toyota Camry to patrol officers. The car was located at the Lucky Lady Casino in Sioux Falls on September 19. After obtaining a search warrant, law enforcement officers had the vehicle towed to the crime lab storage facility where it was processed by the officers and evidence technicians.

[¶13.] Detective Derek Kuchenreuther (Detective Kuchenreuther) of the Sioux Falls Police Department testified regarding the records he recovered from his subpoenas to Verizon for data generated on September 18 between midnight and 2:00 a.m. from phones connecting to the cell-phone towers closest to the place where Thornton's body was found. From this data, he determined that, between 1:12 a.m. and 1:23 a.m., Thornton's and Roubideaux's cell phones were hitting off the same cell tower from approximately the same location near the ditch where Thornton's body was located. Detective Mertes testified that this tower was located 1.65 miles from the spot where Thornton's body was found. Additionally, Detective Mertes testified that he was able to obtain data extracted from the Tracfone[4] Little Long was carrying at the time of his arrest, which led to the discovery of Little Long's social media accounts. Using the data he received from Detective Kuchenreuther and the cell-phone providers, he plotted the path taken by Roubideaux's cell phone from the place where the shooting occurred to the place where Thornton's body was

---

4. Tracfone is a cell phone provider similar to Verizon, but Tracfone contracts with a variety of providers in order to use their networks and cell towers.

dumped. All three phones were connecting to the cell towers along this route at approximately the same times.

[¶14.] The State also called witnesses to testify regarding evidence recovered from the car. Deputy Mark Toft (Deputy Toft) testified that he found fingerprints, which he later determined to be Little Long's, on a Rock Star energy drink located in the passenger side door compartment of the front seat. He also described blood located on the back side of the front passenger seat and in other spots in the car. Deputy Toft described his observation of miniscule droplets of blood covering the driver's seat area which, by its presentation, indicated that it had been expectorated. Forensic experts conducted a DNA analysis, which determined that some of the blood found in or on the vehicle was Thornton's blood, including all the blood found under the rear passenger seat door molding. Dr. Kenneth Snell, the coroner who performed the autopsy, testified that Thornton died of a single gunshot wound to the chest sometime after midnight.

[¶15.] Walking Eagle testified for the State in its case-in-chief and was recalled to the stand several times. She claimed that she had no memory of the night of the incident or her interview with Detective Mertes, despite having watched the recording of her interview outside the presence of the jury to refresh her memory. The circuit court then allowed the State to recall Detective Mertes to impeach Walking Eagle's credibility by introducing the prior statements she made to him about Little Long.

[¶16.] At the end of the State's case, Little Long moved for judgment of acquittal. The circuit court denied the motion, and the case proceeded to the

defense's case-in-chief. Little Long called Ginny Rothwell (Rothwell) to testify in support of his theory that Roubideaux or one of her friends killed Thornton. Rothwell testified that on September 18, she and Frederick Eagle Tail (Eagle Tail) picked up Roubideaux and took her to get some food. They stopped at the Kum and Go convenience store. Roubideaux stole some items from the store, and the clerk took pictures of Rothwell's car as they drove off. When questioned by law enforcement about the incident, Rothwell told the officers that she had been contacted by Eagle Tail through a Facebook message, and he asked her if she wanted to buy a pistol from him. Rothwell asked Eagle Tail if the gun had been fired. When she learned that it had, she declined to buy it. Little Long argued in closing that Eagle Tail may have tried to sell the pistol for Roubideaux who could have killed Thornton.

[¶17.] As part of his defense, Little Long also focused on the absence of physical evidence against him pointing to the fact that his DNA was not in the car or on the body, and the murder weapon was never found. Focusing on Mangor's and Roubideaux's methamphetamine use that night and Roubideaux's status as an accomplice, he also attacked their credibility. Further, Little Long argued that the State failed to show that he had any motive to kill Thornton.

[¶18.] Little Long rested his case and renewed his motion for judgment of acquittal, which the court denied. The jury returned guilty verdicts for second-degree murder and first-degree manslaughter but acquitted Little Long of first-degree murder. For the crime of second-degree murder, the circuit court sentenced Little Long to life in prison without the possibility of parole.

[¶19.]     Little Long appeals, raising three issues for our review:

I.     Whether the circuit court's evidentiary rulings regarding the testimony of Walking Eagle and her subsequent impeachment were erroneous.

II.    Whether the circuit court violated Little Long's right to be brought to trial within 180 days under SDCL 23A-44-5.1.

III.   Whether the circuit court erred by denying Little Long's motions for judgment of acquittal.

**Analysis and Decision**

**I.     Whether the circuit court's evidentiary rulings regarding the testimony of Walking Eagle and her subsequent impeachment were erroneous.**

[¶20.]     Little Long asserts that the circuit court erred by allowing the State to ask Walking Eagle a series of questions about her statements to Detective Mertes incriminating Little Long, which the State knew she would deny making. In Little Long's view, the hearsay statements were offered for the sole purpose of then calling Detective Mertes to elicit the statements under the guise of impeachment. Little Long submits that the court's rulings admitting this evidence violated three rules of evidence to his prejudice. First, Little Long asserts the court erred by permitting Walking Eagle to review her prior interview, outside the presence of the jury, to determine admissibility under SDCL 19-19-803(5) when she stated it would not help refresh her recollection. Second, he contends that the impeachment evidence was improperly admitted violating SDCL 19-19-613(b) and his Sixth Amendment right to confront Walking Eagle. And finally, Little Long asserts that the admission of the testimony was unfairly prejudicial under SDCL 19-19-403.

[¶21.] In order to evaluate the context in which the statements were permitted, it is necessary to set forth the background leading to their admission. Immediately prior to trial, Walking Eagle was arrested in Pierre on a material witness warrant and transported to Sioux Falls. When the State called Walking Eagle to the stand at trial, she claimed she had no memory of her conversation with Little Long or her subsequent interview with the police. The following colloquy occurred:

| | |
|---|---|
| **The State:** | Okay. I want to specifically turn your attention back to September 18th, the early morning of September 18th. Do you remember that day? |
| **Walking Eagle:** | No. |
| **The State:** | You don't remember that day? |
| **Walking Eagle:** | No. |
| **The State:** | Do you remember having Kelsey Roubideaux and Henry [Little] Long coming to your home that day? |
| **Walking Eagle:** | No. |
| **The State:** | Do you recall talking to Detective Mertes about having Kelsey Roubideaux and Henry [Little] Long coming to your house that day? |
| **Walking Eagle:** | No, I don't. |
| **The State:** | You don't recall being interviewed by law enforcement? |
| **Walking Eagle:** | No. |
| **The State:** | You look confused. What do you remember about that time frame? |
| **Walking Eagle:** | I'm trying to remember the day. I can't even remember back. |
| . . . | |
| **The State:** | If you were to watch that recorded interview, would that refresh your memory as to what took place on September 20th in your conversation with Detective Mertes? |
| **Walking Eagle:** | No. |

[¶22.] After this discussion, the State requested a recess. Once outside the presence of the jury, the State argued the recording was admissible for impeachment purposes under SDCL 19-19-613(b) as extrinsic evidence of a prior

inconsistent statement. The defense objected, asserting that Walking Eagle was unavailable because of her lack of memory regarding these particular statements and therefore not available for cross-examination, which would violate Little Long's Sixth Amendment right to confront the witnesses against him. *See generally Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[¶23.]     The circuit court ruled that it would permit the State to attempt to refresh Walking Eagle's memory by showing her the 21-minute video of her interview with the police because it wanted "the defense to have an opportunity to cross-examine on it." If the tape refreshed her memory, the circuit court held that it would not admit the video. However, if she still could not recall the interview, the court indicated that the video may be admissible under SDCL 19-19-803(5) as evidence of Walking Eagle's past recorded recollection. The court stated that if admitted under this rule, the video would be shown to the jury, but not received as an exhibit.

[¶24.]     After watching the recording, Walking Eagle was recalled before the jury and the following questions were asked:

| | |
|---|---|
| **The State:** | Now Ms. Walking Eagle, you just had an opportunity to review your interview from September 20, 2018, with Detective Mertes. Did that refresh your memory as to what you had talked to Detective Mertes about? |
| **Walking Eagle:** | No, it hasn't. |
| **The State:** | That did not refresh your memory at all? |
| **Walking Eagle:** | No. |
| **The State:** | Watching yourself be interviewed on September 20th did not refresh your memory as to what you said to him? |
| **Walking Eagle:** | No. |

| | |
|---|---|
| **The State:** | Okay. And the information would have been on September 20th in regards to an incident that took place on September 18th; is that correct? |
| **Walking Eagle:** | I don't know. |
| **The State:** | Did you watch that interview? |
| **Walking Eagle:** | Yes, I did. |
| **The State:** | Did you see yourself in that interview? |
| **Walking Eagle:** | I seen somebody. |
| **The State:** | Okay. Sounded like you? |
| **Walking Eagle:** | Sounded like me. |
| **The State:** | Looked like you? |
| **Walking Eagle:** | Pretty high, yeah. |
| . . . | |
| **The State:** | And you don't recall what you're—you don't recall today what you told him at that time? |
| **Walking Eagle:** | No, I don't. |
| **The State:** | And that was an audio and a visual recording of you being spoken to by the detective; correct? |
| **Walking Eagle:** | I guess it is. |
| **The State:** | And that, you would agree with me, would reflect your knowledge as of September 20th of what you knew of the incident? |
| **Walking Eagle:** | No. |
| **The State:** | That would not have accurately reflected your knowledge? |
| **Walking Eagle:** | No, I don't remember any of it. |

[¶25.]     The State again excused her from the stand and called another witness. Thereafter, the court met with counsel outside the presence of the jury to discuss the admissibility of the video under various exceptions to the hearsay rule. The court, while acknowledging *Crawford's* nearly categorical holding that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements," *State v. Toohey*, 2012 S.D. 51, ¶ 16, 816 N.W.2d 120, 128 (quoting *Crawford*, 541 U.S. at 59 n.9, 124 S. Ct. at 1369 n.9), nonetheless declared Walking Eagle unavailable after expressing concerns as to whether the United States Supreme Court had definitively ruled on this issue where a witness has no memory of the events in

question.[5] The court reasoned that because courts were divided on how to treat a witness who claimed no memory of an event and this Court had not yet spoken on this precise question, the best approach was to deem her unavailable. Based on Walking Eagle's testimony that she could not remember her conversation with Detective Mertes or its contents, the court held that the video was hearsay, not within any of the stated exceptions and therefore inadmissible. Whereupon, the State recalled Walking Eagle and asked her a series of direct questions including:

| | |
|---|---|
| **The State:** | Do you know Kelsey Roubideaux. |
| **Walking Eagle:** | No, I don't. |
| . . . | |
| **The State:** | You don't know her at all? |
| **Walking Eagle:** | No, I don't. |
| **The State:** | Have you ever known Kelsey Roubideaux to be at your home? |
| **Walking Eagle:** | My home? No. |
| . . . | |
| **The State:** | On September 18 of 2018 in the early morning hours, did you have a conversation with Henry [Little] Long? |
| **Walking Eagle:** | No. |
| **The State:** | Did Henry [Little] Long come to your house? |
| **Walking Eagle:** | No. |
| . . . | |
| **The State:** | Did Henry [Little] Long tell you that morning that he had shot a man? |
| **Walking Eagle:** | No. |

[¶26.] Based on the State's exchange with Walking Eagle, the State requested a recess. Once outside the presence of the jury, the State informed the court that it intended to impeach Walking Eagle's credibility by using her prior inconsistent statements to law enforcement made during her police interview. In particular, the State argued that Walking Eagle's prior statements to police,

---

5. The State did not file a notice of review to challenge this ruling on appeal.

including her statement that Little Long confessed to her, were inconsistent with her testimony that she did not speak with Little Long on the night of the killing. Arguing that extrinsic evidence was permitted to impeach a witness's credibility in this context, the State again requested admission of the video of Walking Eagle's interview.

[¶27.] The court agreed that the statements were inconsistent and, after performing the requisite balancing test under Rule 403, held that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The court, however, denied the request to introduce the entire recorded interview.[6] Instead, the court indicated it would admit only those portions of the recording that were impeaching and that it would give limiting instructions at the time the evidence was elicited and as part of the final written instructions of law.

[¶28.] The defense again objected to admission of the recording as unnecessary and prejudicial. In response, the State withdrew its request to introduce the video and offered to introduce the inconsistent statements through Detective Mertes, which the court approved. The State then requested and received permission to recall Walking Eagle. The court brought the jury back into the courtroom, and the State asked Walking Eagle a series of questions including the following:

> **The State**: When he [Little Long] came to your house on the early morning of September 18th, did he have a pair of red shoes with him?
> **Walking Eagle**: No.

---

6. The circuit court also ordered the State to redact the video to remove certain statements that it found unfairly prejudicial under Rule 403.

| | |
|---|---|
| **The State:** | Did he have a wallet? |
| **Walking Eagle:** | No. |
| **The State:** | Did he have a gun? |
| **Walking Eagle:** | No. |
| **The State:** | At one point[,] did he take out the gun and put it on the table? |
| **Walking Eagle:** | No. |
| . . . | |
| **The State:** | Did you—Did he tell you: "I f***ing killed someone tonight?" |
| **Walking Eagle:** | No. |
| **The State:** | Was Kelsey Roubideaux in your house that early morning? |
| **Walking Eagle:** | No. |
| . . . | |
| **The State:** | Did Henry tell you: "I'm coming for you, Mom, if you tell anybody; I love you, but I'm coming for you?" |
| **Walking Eagle:** | No. |

After her testimony, the State excused Walking Eagle from the stand and called

Detective Mertes, who testified in part as follows:

| | |
|---|---|
| **The State:** | Now, did you ask Ms. Walking Eagle if she knew a Kelsey Roubideaux? |
| **Mertes:** | I did. |
| . . . | |
| **The State:** | Did she indicate she knew Kelsey Roubideaux? |
| **Mertes:** | Yes, she did. |
| . . . | |
| **The State:** | Did she indicate whether Kelsey Roubideaux and Henry [Little] Long had come to her home that early morning? |
| **Mertes:** | She did. |
| . . . | |
| **The State:** | Specifically in regards to Henry [Little] Long, did [Walking Eagle] tell you about any conversation she had with Henry [Little] Long that morning? |
| **Mertes:** | She did. |
| **The State:** | What did she tell you? |
| **Mertes:** | She stated that Mr. [Little] Long had asked her back into her bedroom and then began to make statements about what had taken place earlier. |
| **The State:** | And what did she tell you he had told her? |
| **Mertes:** | He said that he'd shot a man. |

-15-

| | |
|---|---|
| **The State:** | Did she tell you what led up to him shooting the man or what the defendant told her had led up to the shooting? |
| **Mertes:** | That there was an argument taking place in the vehicle, and that basically he and Mr. Thornton— |
| . . . | |
| **The State:** | Did Ms. Walking Eagle indicate to you that [Little Long] had told her "I f***ing killed someone tonight"? |
| . . . | |
| **Mertes:** | Yes.[7] |

Detective Mertes, also testified that Walking Eagle said that Little Long brought a pair of red shoes, a wallet, and a handgun into the house with him.

[¶29.] We review a circuit court's evidentiary rulings for an abuse of discretion. *State v. Janklow*, 2005 S.D. 25, ¶ 32, 693 N.W.2d 685, 697 (citations omitted). However, we review whether Little Long's Sixth Amendment right to confrontation was violated de novo. *State v. Spaniol*, 2017 S.D. 20, ¶ 23, 895 N.W.2d 329, 338 (citations omitted).

### *Recorded recollection refreshed: SDCL 19-19-803(5)*

[¶30.] Hearsay is "a statement that: (1) [t]he declarant does not make while testifying at the current trial or hearing; and (2) [a] party offers in evidence to prove the truth of the matter asserted in the statement." SDCL 19-19-801(c). There are many exceptions to the rule against hearsay, regardless of the availability of the declarant, including a recorded recollection of a statement made by a witness while

---

7. At the close of the State's case, the court told the parties that before it permitted Detective Mertes to testify, it again conducted the Rule 403 balancing test and found the probative value of the impeachment questions were not substantially outweighed by the danger of unfair prejudice.

the matter was fresh in the mind of the witness which accurately reflects that knowledge. SDCL 19-19-803(5).[8]

[¶31.]       Little Long first argues that the circuit court abused its discretion by allowing Walking Eagle to view the video of her interview because she testified it would not refresh her memory. We see no abuse of discretion in the court's decision. SDCL 19-19-612(a) "provide[s] for the method of refreshing witness recollection called present recollection refreshed." *Carpenter v. City of Belle Fourche*, 2000 S.D. 55, ¶ 20, 609 N.W.2d 751, 760 (quoting John W. Larson, *South Dakota Evidence* § 612.1 at 438 (1991)). "This involves the use of anything that will actually trigger the witness' memory so that the witness may thereafter actually testify from memory. Anything that will cause the memory to be regained, . . . is permitted." *Id.* (citation omitted) (internal quotation mark omitted). Here, the State apologized to the court, stating that it was unaware that Walking Eagle's testimony would deviate from what she previously said in her interview. Allowing the State to show her the video outside the presence of the jury was a reasonable step to take to

---

8.       SDCL 19-19-803(5) provides in relevant part:

> The statements described in this section are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> . . .
>
> (5) Recorded recollection. A record that:
> (A) Is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;
> (B) Was made or adopted by the witness when the matter was fresh in the witness's memory; and
> (C) Accurately reflects the witness's knowledge.

refresh the memory of the witness and, as the court noted, to ensure that she was subject to cross-examination on the contents of the interview.

[¶32.] Little Long next argues that bringing Walking Eagle before the jury a second time was improper because she did not claim knowledge of her interview even though she had just watched it. While it may have been a better practice to determine whether her recollection was refreshed outside the presence of the jury, the court ultimately denied the State's request to introduce the evidence under SDCL 19-19-803(5). Though the court believed the exception applied, it found that the State had not established sufficient foundation for the introduction of the recorded interview as substantive evidence—a ruling the State has not challenged on appeal. Under the circumstances, Little Long has failed to explain how he was prejudiced by this second colloquy, wherein Walking Eagle claimed she had no knowledge of the interview.[9]

***Impeachment by prior inconsistent statements: SDCL 19-19-613***

[¶33.] The credibility of a witness may be attacked by any party, including the party that called the witness. SDCL 19-19-607. Even when the prior

---

9. The State submits that Little Long's threat to Walking Eagle that he would be "coming for her," if she told anyone that he killed someone that night, was likely the reason for her feigned "amnesia and unavailability." In the State's view, such evidence was admissible per SDCL 19-19-804(b)(6) as a statement offered against a party that wrongfully and intentionally caused the declarant's unavailability. At trial, the State argued unsuccessfully that the threat served as a basis for the application of SDCL 19-19-804(b)(3)'s hearsay exception for statements against interests, but it did not identify SDCL 19-19-804(b)(6) as a basis. The circuit court did not, accordingly, have an opportunity to consider the issue, and we decline to address the argument for the first time on appeal.

inconsistent statement is ordinarily inadmissible, it may be admitted for the limited purpose of impeaching the witness under SDCL 19-19-613(b).[10]

[¶34.]     In order "[t]o properly impeach, the prior statement must be inconsistent with the witness's current testimony and it must not be on a collateral issue." *State v. Wills*, 2018 S.D. 21, ¶ 13, 908 N.W.2d 757, 762 (citation omitted). The witness may be asked if "he or she made the prior statement without disclosing its contents to the witness." *Id.* (citing SDCL 19-19-613(a)). But upon request, the statement must be shown to opposing counsel. *Id.* (citing SDCL 19-19-613(a)). "If the witness admits making the statement, no further foundation is necessary." *Id.* Should the witness deny making the statement, however, extrinsic evidence may be introduced to prove that the witness made an inconsistent statement. *Id.* (citing SDCL 19-19-613(b)).

[¶35.]     It is uncontested that the statements were clearly inconsistent, previously disclosed, and given under an appropriate limiting instruction prior to Detective Mertes's testimony.[11] *See State v. Gage*, 302 N.W.2d 793, 798 (S.D. 1981)

---

10.    SDCL 19-19-613(b) provides in relevant part:

> Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. This subdivision (b) does not apply to an opposing party's statement under subdivision 19-19-801(d)(2).

11.    Before permitting the impeachment testimony, the circuit court instructed the jury as follows:

> Sometimes evidence is received for a very limited purpose, and that's what's going to happen with the answer to this question and some of

(continued . . .)

(identifying four requirements for admitting prior inconsistent statements).
However, Little Long argues that because the prior inconsistent statements could
not be offered for the truth of the matters asserted, they lacked relevance given
Walking Eagle's initial testimony denying any recollection of the events about
which she was being questioned. *See id.* at 789 (requiring that, to be relevant, the
inconsistency must be such that the State's "case will be adversely affected if the
inconsistent testimony is allowed to stand" (quoting *United States v. Rogers*, 549
F.2d 490, 496 (8th Cir. 1976)). In response, the State maintains the prior
inconsistent statements were highly probative because, if left unanswered, Walking
Eagle's denials regarding whether she knew Roubideaux and whether Roubideaux
and Little Long came to her house on the morning in question were directly
contradictory to the testimony of Roubideaux, the State's key eye witness.

[¶36.]     We agree that some of Walking Eagle's prior inconsistent statements
were relevant to impeach her credibility as to these particular matters. However,
the relevancy of Walking Eagle's prior statements pertaining to Little Long's
confession and his other actions on the morning in question cannot be gauged by

---

(. . . continued)

> the questions to follow. It's received for a limited purpose. And let me
> try to explain that a little bit more. So the credibility of Margaret
> Walking Eagle may be attacked by introducing evidence that on some
> former occasion Ms. Walking Eagle made a statement on a matter of
> fact or acted in a manner inconsistent with her testimony in this case
> on a material—excuse me, on a matter material to the issues.
> Evidence of this kind may be considered by you in connection with all
> the other facts and circumstances in evidence in deciding the weight to
> be given to the testimony of Margaret Walking Eagle. But you must
> not consider any such prior statement as establishing the truth of any
> fact contained in that statement.

considering the truth of the matters asserted. In this vein, Little Long further argues that because no evidence contrary to Walking Eagle's denials as to these particular events had been admitted in the State's case, the probative value of Walking Eagle's prior inconsistent statements for impeachment purposes was minimal because there was no substantive testimony to impeach. Little Long asserts that the State used Walking Eagle as a "strawman" to "blatantly back-door[]" the admission of evidence that would otherwise be inadmissible, violating his confrontation rights in the process.

[¶37.] In *Rufener II*, we made clear that SDCL 19-19-607 prohibits the State from calling a witness "only to serve as a 'strawman' for the introduction of inadmissible hearsay . . . ." *State v. Rufener (Rufener II)*, 401 N.W.2d 740, 744 (S.D. 1987) (citation omitted). And although "impeachment of one's own witness" by prior inconsistent statement "may be permitted, this does not go so far as to permit the use of the rule as a subterfuge to get to the jury evidence otherwise inadmissible." *Id.* (citation omitted). Therefore, we counseled that when deciding whether to admit such evidence, courts "must exercise extreme caution when the impeaching evidence goes beyond simply proving that the witness was incredible and begins to persuade by illegitimate means." *Id.*

[¶38.] Indeed, the difference between impeachment evidence and substantive evidence can be subtle and a jury can miss the difference. *Id.* (citation omitted). Impeachment evidence is evidence introduced into the record for the limited purpose of attacking a witness's credibility. As such, it is not offered for the truth of the matter asserted and is not hearsay. *Wills*, 2018 S.D. 21, ¶ 12, 908 N.W.2d at

762 (holding impeachment, by definition, is not hearsay). In contrast, evidence is substantive when the purpose for its admissibility is not to attack a witness's credibility, but rather to admit the prohibited hearsay for its truth in order to prove the defendant's guilt. *Rufener II*, 401 N.W.2d at 744 (citation omitted).

[¶39.]     The State's reason, at least initially, for calling Walking Eagle to the stand did not, as Little Long argues, center around admitting the impermissible hearsay statements in the police interview. It was only after Walking Eagle, to the State's apparent surprise, refused to answer questions regarding Little Long's admissions and his other actions that night that the State sought to impeach her by introducing her prior statements to Detective Mertes. However, after Walking Eagle twice denied any recollection of the events surrounding her contact with Roubideaux and Little Long and also denied any recollection of her interview with the detective, the State then recalled her a third and fourth time to ask her very specific questions that essentially parroted the statements Walking Eagle had related in her interview with Detective Mertes. By this time, the State can no longer claim it was surprised by her denials, and it is apparent that the State's additional specific questions were posed as a predicate to then offer extrinsic evidence of Walking Eagle's contrary statements to Detective Mertes. Because of the potential that the jury might consider these statements for more than just impeachment, we must address the Rule 403 concerns arising from the admission of such evidence.

***Balancing test: SDCL 19-19-403***

[¶40.] This Court's analysis in *Rufener II*, which focused on the State's motives, is an elusive test requiring us to analyze a prosecutor's state of mind. Other courts, including the Eighth Circuit Court of Appeals, look not to the prosecutor's motives, but instead to the admissibility of the impeachment evidence under Rule 403 when analyzing whether the impeachment evidence is a "mere subterfuge." *See, e.g.*, *United States v. Logan*, 121 F.3d 1172, 1175 (8th Cir. 1997); *United States v. Ince*, 21 F.3d 576, 580 (4th Cir. 1994). Under SDCL 19-19-403, a court may exclude even relevant evidence, "if its probative value is substantially outweighed" by the danger of unfair prejudice. Balancing the evidence under Rule 403 is the "clearly preferable approach" because it does not require that we speculate regarding a prosecutor's motivations. Jeffrey Bellin, *30B Fed. Prac. & Proc. Evid.* § 6729 (2021 ed.). We hold this is a more reliable form of analysis.

[¶41.] Applying Rule 403's balancing test, rather than trying to discern motive, is both practical and logical because both "inquiries will often get to the same answer." *Id. See also United States v. Buffalo*, 358 F.3d 519, 527 (8th Cir. 2004) ("Eighth Circuit case law clearly provides that the probative value of a Rule 613(b) prior inconsistent statement must be weighed against the prejudicial effect of its admission . . ." (citing *Logan*, 121 F.3d at 1175)). This is because when the State "introduces testimony that provides no real harm to [the] case," its evidentiary weight with respect to the substantive issues of the case is minor. Bellin, *supra* ¶ 40, at § 6729. As a consequence, "the probative value of impeachment will be miniscule." *Id.* However, when the prior inconsistent statement is highly

prejudicial,[12] "[t]he jury would be tempted to rely on the out-of-court statement not for the proper, miniscule purpose of impeaching the witness' testimony, but rather for the improper purpose . . . ." *Id.* Therefore, balancing the admissibility of the proffered evidence under Rule 403 leads to the more reliable result.

[¶42.] Little Long argues that the circuit court erred in its Rule 403 determination because the probative value of impeaching the testimony of Walking Eagle is negligible when compared to the inflammatory nature of his admissions to Walking Eagle. We agree.

[¶43.] In *Ince*, the Fourth Circuit applied the Rule 403 balancing test to nearly the same scenario that we review today. 21 F.3d at 580. In that case, the witness testified that she could not remember a previous statement she made to law enforcement in which she stated that the defendant admitted to committing the crime. The court concluded that Rule 403 required exclusion because the risk of unfair prejudice "is multiplied when the statement offered as impeachment testimony contains the defendant's alleged admission of guilt." *Id.* at 581. Along these lines, it held that a court "should rarely, if ever, permit the Government to 'impeach' its own witness by presenting what would otherwise be inadmissible hearsay if that hearsay contains an alleged confession to the crime for which the defendant is being tried." *Id.*

---

12. Under "Rule 403, 'prejudice' does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *Rufener II*, 401 N.W.2d at 744 n.3 (citation omitted).

[¶44.]        In this case, Detective Mertes's testimony in which he repeated Walking Eagle's statement that Little Long said "I f***ing killed someone tonight" was highly prejudicial.  While Walking Eagle's statements to police had significant probative value with respect to proving Little Long's guilt, they were not, and could not, be admitted under this exception for this purpose, and therefore, the *impeachment* value of the statements was limited.  The State could have used a number of other inconsistent statements to impeach Walking Eagle, but instead chose to "impeach" her testimony, that she never interacted with Little Long on the date in question, by eliciting the most prejudicial statement she had previously claimed Little Long made to her.  Because of the potential danger of the jury considering this testimony for the truth of the matters asserted, the Rule 403 concerns substantially outweighed the probative value of this statement for impeachment purposes.  Thus, we conclude that the circuit court abused its discretion by admitting Walking Eagle's prior statements made to Detective Mertes detailing Little Long's alleged confession and other actions that evening.  While our ruling does not hinge on the prosecutor's motives, we caution prosecutors to refrain from attempting to admit so-called impeachment evidence, which is nothing more than a subterfuge for hearsay.  And although the court twice performed the balancing test, it failed to correctly weigh the prejudicial effect of Little Long's statements made to Walking Eagle.

### *Confrontation Clause*

[¶45.]        With regard to Little Long's claim that his confrontation rights were violated, the Sixth Amendment provides that the accused enjoys the right "to be

confronted with the witnesses against him . . . ." U.S. Const. amend. VI. "A violation of the Confrontation Clause 'occurs when the witness making the testimonial statements is both unavailable and has not previously been subject to cross-examination.'" *State v. Rodriguez*, 2020 S.D. 68, ¶ 46, 952 N.W.2d 244, 257 (quoting *State v. Richmond*, 2019 S.D. 62, ¶ 30, 935 N.W.2d 792, 801); *See also Crawford*, 541 U.S. at 59, 124 S. Ct. at 1369. Testimonial statements are loosely defined as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *State v. Reinhardt*, 2016 S.D. 11, ¶ 7, 875 N.W.2d 25, 27 (quoting *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364). Testimonial hearsay includes, at a minimum, "police interrogations and 'prior testimony at a preliminary hearing, before a grand jury, or at a former trial.'" *Richmond*, 2019 S.D. 62, ¶ 27, 935 N.W.2d at 800 (quoting *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374).

[¶46.] Here, it is evident that Walking Eagle's statements to the police, two days after the killing, were designed to be used for prosecutorial purposes, and the statements were not previously subject to cross-examination. However, the court admitted the statements, not for the truth of the matters asserted, but solely for impeachment. Because statements offered for impeachment are not, by definition, hearsay, their admission does not implicate the Confrontation Clause concerns addressed by *Crawford*. *See Wills*, 2018 S.D. 21, ¶ 12, 908 N.W.2d at 762. Nevertheless, because of the Rule 403 prejudice concerns we have identified in this case, we address the merits of Little Long's Confrontation Clause claim in the event the jury may have improperly considered the statements for the truth of the matters asserted notwithstanding the court's admonishment.

[¶47.] Importantly, the circuit court, when ruling that Walking Eagle was unavailable, did not have the benefit of our recent decision in *Rodriguez*, 2020 S.D. 68, ¶¶ 47-52, 952 N.W.2d at 257-59.[13] In *Rodriguez*, we held that a witness may be unavailable under an evidentiary hearsay rule, but nevertheless available for confrontation. After a witness in the *Rodriguez* trial could not remember making prior statements to investigating officers, the circuit court declared her unavailable under the provisions of SDCL 19-19-804(a)(3). However, upon review, we held that this determination did not mean the witness was unavailable for purpose of the Confrontation Clause which "guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Rodriguez*, 2020 S.D. 68, ¶ 50, 952 N.W.2d at 258 (quoting *United States v. Owens*, 484 U.S. 554, 559, 108 S. Ct. 838, 842, 98 L. Ed. 2d 951 (1988)). By refusing the opportunity to cross-examine, the defendant in *Rodriguez* failed to "establish that he was denied 'the traditional protections of the oath, cross-examination, and opportunity for the [fact-finder] to observe the witness'[s] demeanor' secured by the Sixth Amendment." *Id.* ¶ 51, 952 N.W.2d at 259 (quoting *Owens*, 484 U.S. at 560, 108 S. Ct. at 843) (alteration in original).

[¶48.] Likewise, Little Long chose not to cross-examine Walking Eagle about her initial alleged inability to remember her interview with Detective Mertes, as

---

13. The circuit court recognized the potential that unavailability for the exceptions to the hearsay rule may not preclude availability for purposes of the right of confrontation, but it accurately determined there was, at the time, no definitive holding of this Court in that regard.

well as her later more definitive testimony in which she denied knowing Roubideaux and denied having a conversation with Little Long on the date of the alleged murder. And as we noted in *Rodriguez*, while the decision to forego cross-examination may have been strategic, based on our review of the record, we conclude that Walking Eagle was sufficiently available to satisfy the requirements of the Confrontation Clause. As such, Little Long has not shown a violation of his constitutional rights, and the fact that Walking Eagle's "prior statements were testimonial matters not." *Id.* ¶ 52, 952 N.W.2d at 259 (citing *Toohey*, 2012 S.D. 51, ¶ 18 n.3, 816 N.W.2d at 129 n.3).

***Prejudicial error***

[¶49.] When evidence is improperly admitted at trial, reversal may not always be necessary. To establish reversible error with regards to an evidentiary ruling, "a defendant must prove not only that the trial court abused its discretion in admitting the evidence, but also that the admission resulted in prejudice." *State v. Lassiter*, 2005 S.D. 8, ¶ 13, 692 N.W.2d 171, 175 (citation omitted). "Error is prejudicial when, 'in all probability . . . [it] produced some effect upon the final result and affected rights of the party assigning it.'" *State v. Packard*, 2019 S.D. 61, ¶ 27, 935 N.W.2d 804, 812 (citation omitted) (alteration in original).

[¶50.] While the circuit court erred by permitting the introduction of Little Long's statements to Walking Eagle, a review of the record shows that there is no reasonable probability that the error affected the outcome of the case. While the admission of Little Long's statement that he "f***ing killed a man," was highly prejudicial, the statement was not the lynchpin of the State's case by any measure.

The State presented a strong case against Little Long, which included both direct and circumstantial evidence that he shot Thornton. This evidence included the testimony of two eye witnesses to the crime, Roubideaux and Mangor, each of whom described watching Little Long shoot Thornton in the car.

[¶51.] While Mangor could not identify Little Long at trial, her testimony of what occurred in the car and the details of the killing she described at trial were consistent with Roubideaux's testimony. For instance, both Roubideaux and Mangor stated that they knew each other from a prior meeting at the Nites Inn, that Mangor and Thornton were picked up at 4th and Cliff, and that Mangor and Thornton sat in the back seat of the car. Both agreed that Thornton was paranoid that night and that an argument started during the drive. According to each witness's account, Little Long pulled his gun out twice threatening Thornton. Both described Little Long shooting Thornton in the chest after the second time he drew his weapon. Roubideaux testified Mangor started screaming and jumped out of the moving car. Mangor also recounted her reaction to the shooting, which included describing her decision to jump out of the car and her efforts to pull Thornton out with her. She testified that her shoe slipped off and that she left it in the intersection where the shooting occurred. At trial, Sioux Falls Police Officer Nick Billing testified that he found Mangor's shoe in the middle of the road in the spot she described.

[¶52.] The physical evidence presented to the jury was also substantial. When law enforcement executed a search warrant on the car, they found red marks consistent with blood on the back seat, ceiling, floor, and passenger door. DNA

analysis revealed that Thornton's blood was found under the molding of the passenger door. Deputy Toft testified that the car had a strong odor of bleach or cleaning agents and there were wipe marks present near the red stains. When the back seats were removed, he noticed that the floor was still wet with cleaning solution as though the car had just been cleaned. This corroborated Roubideaux's testimony that she assisted Little Long with cleaning the car at his girlfriend's house after dumping the body.

[¶53.]     As part of the investigation, Detective Kuchenreuther testified that he obtained the cell-phone tower data for September 18 from 12:00–2:00 a.m. from the three towers closest to the location of Thornton's body. Officers identified Roubideaux's, Little Long's, and Thornton's phone numbers and determined that they were all together at the location where Thornton's body was found 1.65 miles from the closest cell tower. Detective Mertes testified that the data revealed that all three phones were stationary for approximately five minutes at this location.

[¶54.]     The coroner's testimony further bolsters Roubideaux's and Mangor's version of events. While on the stand, Dr. Snell explained that the ridging along the right side of the gunshot wound in Thornton's chest suggested that the bullet traveled from right to left, front to back at a slight up to down angle. This was consistent with both witnesses' testimonies that Little Long was seated in the front passenger seat and had turned around to shoot Thornton, who was sitting in the backseat on the driver's side of the car. And although law enforcement did not recover the murder weapon, they did discover three of Little Long's fingerprints on

a can of Rock Star energy drink in the passenger seat door compartment where Little Long was reported to be sitting.

[¶55.] In sum, the circuit court abused its discretion in admitting the evidence under Rule 403. However, we conclude the evidence was cumulative to and independent of the overwhelming evidence that Little Long shot Thornton in front of two eye witnesses. We, therefore, conclude that while the circuit court erred in admitting the statements, such error does not require reversal because from our review of the record, it did not rise to the level of prejudicial error.

## II. Whether the circuit court violated Little Long's right to be brought to trial within 180 days under SDCL 23A-44-5.1.

[¶56.] Little Long does not challenge the circuit court's findings of fact, which were incorporated into its memorandum decision, regarding the 180-day calculation in this case. Nor does he contest that certain delays were properly excludable. Rather, he focuses his argument upon the claim that the circuit court arbitrarily tolled the 89 days between the January 2, 2019 and the April 1, 2019 trial dates without good cause.

[¶57.] We review whether the 180-day period has expired and the existence of good cause for delay under the de novo standard. *State v. Andrews*, 2009 S.D. 41, ¶ 6 n.1, 767 N.W.2d 181, 183 n.1 (citations omitted). The 180-day rule "creates a right to disposition of a criminal case within 180 days unless good cause may be shown for delay." *State v. Sorensen*, 1999 S.D. 84, ¶ 12, 597 N.W.2d 682, 684 (citation omitted). It "is a procedural rule of court and not a constitutional requirement." *Id.* (citation omitted).

[¶58.]      The 180-day period commences when a defendant makes an initial appearance on a charging document before a judicial officer.  *Id.* ¶ 14, 597 N.W.2d at 684.  Per SDCL 23A-44-5.1, "[c]ertain days are properly excluded from this calculation, including 'delay which is occasioned by the defendant's conduct, such as delay caused by pretrial motions . . . and defendant's competency examination . . . .'"  *State v. Two Hearts*, 2019 S.D. 17, ¶ 10, 925 N.W.2d 503, 509 (citation omitted).  "Additionally, the court may find good cause for delay for other exceptional circumstances, not specifically enumerated in [SDCL 23A-44-5.1(4)(g)]."  *Id.* ¶ 11, 925 N.W.2d at 509.

[¶59.]      The 180-day clock began to run in this case on September 21, 2018, when Little Long initially appeared before the circuit court on charges that he killed Thornton.  Little Long's trial commenced 201 days later on April 8, 2019.  But even though more than 180 days had passed between his initial appearance and trial, certain periods of delay may be properly excludable from the calculation.  SDCL 23A-44-5.1(4).  *See State v. Webb*, 539 N.W.2d 92, 95 (S.D. 1995).

[¶60.]      Some procedural history is helpful to analyze Little Long's claim.  In its October 11, 2018 scheduling order, the court imposed a November 21, 2018 motions deadline with a jury trial to begin the week of December 31, 2018.  This date was later moved to January 2, 2019, to accommodate the New Year's holiday.  On October 24, 2018, Little Long's attorney filed a motion for psychiatric examination (competency evaluation) to determine whether Little Long was competent to stand trial.  The court signed an order granting the motion that same day.

[¶61.] On November 16, 2018, Little Long emailed the court administrator's office, with a copy sent to the State's Attorney's office, requesting that a hearing be scheduled to address his "preliminary motions." With the involvement and acquiescence of the parties, court administration set the motions hearing for January 29, 2019, a new motion deadline for February 8, 2019, and a jury trial to begin on April 1, 2019. Little Long's counsel was instructed by court administration to file a formal motion for delay, but counsel failed to do so.

[¶62.] Little Long's counsel then moved to withdraw on January 10, 2019 for a conflict of interest, and the court appointed new counsel. At the January 29, 2019 motions hearing, the parties agreed to move the April 1 trial date to April 8 to accommodate several witnesses. Because the trial date was now more than 180 days from the date of Little Long's initial appearance, the State raised the issue of the 180-day rule. The court set an evidentiary hearing for February 5, 2019 to determine whether any periods of delay were properly excludable. The court was also informed at the January 29 hearing that the competency evaluation had not been completed because Little Long believed he did not need one. After some discussion with his counsel at the hearing, Little Long agreed to participate in the competency evaluation before the April 8, 2019 trial date.

[¶63.] Following the February 5, 2019 hearing, the court issued a written decision excluding two periods of delay from the 180-day calculation—the period caused by Little Long's request for a motions hearing date which moved the trial date to April 1, 2019 and the delay caused by the filing of a motion for a competency evaluation. Not only did the court find that both delays were excludable for specific

reasons identified under the statute, it also found, in the alternative, that both constituted good cause for delay pursuant to the more general provision in SDCL 23A-44-5.1(4)(g).

[¶64.]    The changes in scheduling, according to the circuit court, were functionally equivalent to Little Long requesting a continuance of the trial date because neither party objected to the new deadlines. SDCL 23A-44-5.1(4)(b) provides for tolling during "the period of delay resulting from a continuance granted at the request or with the consent of the defendant or his counsel provided it is approved by the court and a written order filed." And although the court acknowledged that no formal motion was filed or written order issued, the court faulted Little Long's counsel for failing to file the motion as directed. It is well-established that, "where a defendant assents to a period of delay and later attempts to take advantage of it, courts" loathe "find[ing] a violation of an accused's speedy trial rights." *State v. Cottrill*, 2003 S.D. 38, ¶ 11, 660 N.W.2d 624, 630. Because the delay occurred at Little Long's counsel's request, the court found that Little Long consented to the delay between January 2, 2019 and April 1, 2019. Regardless of whether the court's ruling falls within the parameters of SDCL 23A-44-5.1(4)(b), it did not err in concluding that the actions of Little Long, via his counsel, constituted good cause for excluding this period of delay.

[¶65.]    Further, the trial was also delayed as a result of defense counsel's October 24, 2018 motion for a competency evaluation. When the circuit court ruled on the defense's 180-day motion on February 5, 2019, it noted that Little Long's evaluation was still pending. Little Long argues that this period of time cannot be

used to toll the rule because he told his attorney that he did not wish to be evaluated and insisted that he was competent to stand trial. Counsel filed the motion for the evaluation to protect Little Long's interests because "an incompetent defendant cannot be legally tried." *See State v. Ceplecha*, 2020 S.D. 11, ¶ 36, 940 N.W.2d 682, 693.

[¶66.]	The court found that it was "[Little] Long's prior refusal to cooperate with the evaluation[,]" and not the State's actions, that created the delay. Therefore, even if the request for a pre-trial motions hearing had not delayed the first trial date, the court concluded that the trial could not have taken place on January 2, 2019 due to the unresolved competency issue.[14] Competency, the court noted, is one of the reasons specifically enumerated in SDCL 23A-44-5.1 which is properly excludable under the 180-day rule. *See* SDCL 23A-44-5.1(4)(a). This period of delay is in no way associated with the State and is properly excludable.

[¶67.]	In summation, when excluding the periods of delay identified by the court using either the October 24, 2018 or January 2, 2019 start date through April 1, 2019, it is clear that Little Long's trial occurred well within the 180-day rule. The circuit court did not err by so concluding.

### III.	Whether the circuit court erred by denying Little Long's motions for judgment of acquittal.

[¶68.]	We review a circuit court's denial of a motion for judgment of acquittal de novo to determine whether there is sufficient evidence to sustain the conviction. *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83 (citation omitted). This

---

14.	The record does not indicate the date on which the competency evaluation was completed but it was still pending as of the February 5 hearing.

standard requires that we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lawrence v. Weber*, 2011 S.D. 19, ¶ 8, 797 N.W.2d 783, 785 (citation omitted). When reviewing the evidence, we accept the "most favorable inferences fairly drawn therefrom, which will support the verdict." *State v. Harruff*, 2020 S.D. 4, ¶ 15, 939 N.W.2d 20, 25 (citation omitted). "Moreover, 'the jury is . . . the exclusive judge of the credibility of the witnesses and the weight of the evidence.'" *State v. Johnson*, 2009 S.D. 67, ¶ 10, 771 N.W.2d 360, 365 (citation omitted). Accordingly, this Court will not resolve conflicting evidence, assess the credibility of witnesses, or reevaluate the weight of the evidence. *Id.*

[¶69.]    A defendant is guilty of second-degree murder if he "perpetrate[s] . . . any act imminently dangerous to others and evincing a depraved mind, without regard for human life, although without any premeditated design to effect the death of any particular person, including an unborn child." SDCL 22-16-7. Additionally, the State must prove that the defendant's conduct established that he was acting with a depraved mind. *State v. Primeaux*, 328 N.W.2d 256, 258 (S.D. 1982) (citation omitted). "This mens rea requirement involves less culpability than the element of premeditation required for first-degree murder." *Harruff*, 2020 S.D. 4, ¶ 39, 939 N.W.2d at 30 (citation omitted).

[¶70.]    Because he was acquitted of first-degree murder, Little Long contends that the "default is not Murder in the Second Degree, it is Manslaughter in the First Degree" with its lesser mens rea requirement. Little Long emphasizes that

the State's theory of the case was that Little Long acted with a premeditated design to kill Thornton. Because the jury acquitted Little Long of first-degree murder, he concludes that the evidence was therefore insufficient to prove that he acted with a "depraved heart." Little Long argues that he was not waiving or discharging the gun randomly, so his conduct was "either intentional, premeditated First-Degree Murder, or it is First-Degree Manslaughter with a deadly weapon." In support of this contention, he relies upon authority from other courts involving scenarios that reflect depravity of heart, such as firing a gun into a crowd. *See, e.g.*, *State v. Brooks*, 962 So. 2d 1220 (La. Ct. App. 2007).

[¶71.]     We previously rejected similar arguments in *State v. Laible*, 1999 S.D. 58, 594 N.W.2d 328 and more recently, in *State v. Harruff*, 2020 S.D. 4, 939 N.W.2d 20. In *Laible*, we explained that "[i]f a person is able to act with 'a lack of regard for the life of another,' then that person can be convicted of second[-]degree murder." 1999 S.D. 58, ¶ 13, 594 N.W.2d at 332 (first alteration in original) (citation omitted). Therefore, unless there is insufficient evidence in the record to support the second-degree murder conviction, the conviction shall stand even if the jury rejects the State's theory that the defendant acted with the premeditation necessary for a first-degree murder conviction.

[¶72.]     In *State v. Mulligan*, we addressed the question of inconsistent verdicts where the defendant was acquitted of first-degree murder but convicted of second-degree murder.[15] 2007 S.D. 67, ¶ 11, 736 N.W.2d 808, 814. We held that "a criminal defendant convicted by a jury on one count cannot attack that conviction

---

15.     We do not hold or suggest that the jury's verdicts were inconsistent here.

because it was inconsistent with the jury's verdict of acquittal on another count." *Id.* (quoting *United States v. Powell*, 469 U.S. 57, 58, 105 S. Ct. 471, 473, 83 L. Ed. 2d 461, 464 (1984)). Juries are not "required to explain their" verdicts, and appellate courts, rather than speculating about potential juror error, "should review the sufficiency of the evidence to support the conviction that was rendered." *Id.* ¶¶ 11–12, 736 N.W.2d at 814-15 (citing *Powell*, 469 U.S. at 67, 105 S. Ct. at 478).

[¶73.] With respect to his claim regarding insufficiency of the evidence, Little Long argues that the jury could not conclude that he had a depraved heart based on the facts in this record. However, contrary to Little Long's position, the State presented ample evidence to support the jury's verdict convicting Little Long of second-degree murder.

[¶74.] As we previously noted, two eye witnesses saw Little Long shoot Thornton, an unarmed man, at close range in the chest. Mangor testified that right before he died, Thornton told Little Long, "You're not going to keep on waving that gun around." She also testified that Little Long pointed the gun at her head before threatening Thornton and subsequently pulling the trigger and shooting him. This type of conduct evinces depravity of mind, which requires the accused to act "without regard for human life[.]" SDCL 22-16-7. Based upon our review of the evidence presented at trial, in the light most favorable to the prosecution, there is sufficient evidence for a jury to find the essential elements of second-degree murder beyond a reasonable doubt. The circuit court did not err when it denied Little Long's motions for judgment of acquittal.

## Conclusion

[¶75.] The circuit court erred when it admitted certain statements for impeachment purposes, but such error, based on our review of the evidence in the record, does not rise to the level of prejudicial error requiring reversal. The circuit court did not err when it concluded the State complied with the 180-day rule. Finally, sufficient evidence exists within this record to support Little Long's convictions.

[¶76.] JENSEN, Chief Justice, and SALTER and DEVANEY, Justices, and GILBERTSON, Retired Chief Justice, concur.

[¶77.] MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.